UNITED STATES of America,
Plaintiff-Appellee,

v.

Edward J. ROBINSON,
Defendant-Appellant.

No. 79–5203.

United States Court of Appeals,
Sixth Circuit.

Argued April 11, 1980.

Decided June 9, 1981.

Sharon Edwards, George Edwards, Detroit, Mich., for defendant-appellant.

James K. Robinson, U. S. Atty., Martin Reisig, Detroit, Mich., Thomas H. Sear, Asst. U. S. Atty., New York City, for plaintiff-appellee.

Before ENGEL and JONES, Circuit Judges, and CECIL, Senior Circuit Judge.

NATHANIEL R. JONES, Circuit Judge.

Edward J. Robinson, Arnold Aronoff and Jerome Castle were indicted in the Southern District of New York for fraudulently inducing Penn-Dixie Industries, Inc., to purchase undevelopable swampland in Putnam County, Florida. Robinson's trial was severed from that of his co-defendants and transferred to the Eastern District of Michigan. He appeals from his jury conviction for aiding and abetting a mail and a wire fraud in violation of 18 U.S.C. §§ 1341, 2 and 1343, 2, respectively. Robinson argues that: (1) the three-count indictment relating to him is multiplicitous and duplicitous; (2) the district court erred by failing to

grant a directed verdict on the substantive offenses due to an acquittal on a conspiracy count; (3) the mail fraud for which he was convicted is independent of the underlying fraud alleged in the indictment; and (4) the Assistant United States Attorney's closing argument improperly commented on his failure to testify and present a defense. Because we hold that these and other allegations of error are without merit, the conviction is affirmed.

### EVENTS

In 1967, Edward J. Robinson was appointed Executive Director of the Metropolitan Detroit Citizens Development Authority (MDCDA). MDCDA was a coalition of citizens working to develop comprehensive urban redevelopment strategies. In 1971, Robinson met Arnold Aronoff, an experienced real estate investor who served as a Trustee of MDCDA. Shortly thereafter, Robinson terminated his employment and formed two businesses. The E. J. Robinson Company specialized in real estate development and federally-subsidized multi-family housing programs. The Detroit Equity Group marketed real estate tax shelters for wealthy individuals.

In early 1971, Aronoff hired Robinson to prepare a comprehensive "feasibility study" of the economic, legal and social factors for a 2,000-acre development in Deerfield Park, Florida. Robinson's final report was submitted to the federal government to obtain loan guarantees. Robinson also participated in a 120-plat single-family home and 200-acre campground development. Aronoff, as grantor of a trust, participated as one of Robinson's partners in the campground development. Additionally, Robinson served as a director of PAXCO, a company specializing in land development in Florida. As a result, Robinson became a sophisticated, experienced businessman, expert in real estate development and Aronoff's close personal friend.

During this time period, Aronoff was the principal owner of Levy and Company, a Michigan-based corporation marketing ready-mix concrete. Levy and Company was Penn-Dixie's major Michigan account. Penn-Dixie is a publicly-held steel and cement company, headquartered in New York City. Since 1967, Penn-Dixie and Levy and Company have been involved in numerous complex financial transactions together. Jerome Castle, who controlled Penn-Dixie, and Aronoff were business partners and intimate friends for many years.

Having introduced the major actors in this case, and set as a backdrop their symbiotic business and personal relationships, the scheme to defraud Penn-Dixie of several million dollars unfolds. In the spring of 1973, Aronoff, through a foreign trust he controlled, obtained an option to purchase a 12,500-acre tract in Putnam County, Florida. The eastern 5,500 acres is primarily mosquito-infested swampland; the land in the western 7,000 acres is higher, drier and had several buildings on it. The option price for the 12,500 acres was $5,250,000. Aronoff, Castle and Robinson devised a scheme by which Penn-Dixie was to purchase the relatively worthless eastern 5,500-acres for $5,800,000 or $550,000 more than the price paid by Aronoff for the entire 12,500 acres. Robinson provided false validity to the notion that the eastern 5,500 acres were developable and could be quickly resold by Penn-Dixie for a handsome profit.

On May 30, 1973, Robinson sent the following letter on the stationery of the Edward J. Robinson Company to Penn-Dixie outlining a proposed development of the eastern 5,500 acres:

It has been brought to my attention that you have under your control a sizeable track of vacant land in Putnam County, Florida. . . .

Currently I represent an experienced development group that desires to undertake a large scale community project in Florida. . . . I also represent investors who are interested in equity positions in large scale developments. I have talked with some of them tentatively about this development. These gentlemen include Mr. Arnold Aronoff, Vice President of the Edward C. Levy Company, Harold McGregor, Director of Lear Siegler Cor-

poration, John, Joseph & Jerry Steward of Fabristeel Products & Multifastener.

On a preliminary basis I would like to discuss with you a joint venture which would provide your firm with considerable return on your investment .... your company would have a substantial partnership equity interest in the profits of this development....

The letter was false in several material aspects. First, Robinson knew that Penn-Dixie did not "control" the property but was considering its purchase at $1,050 per acre. Second, Robinson had not determined the feasibility of the development of the property. Indeed, there is every indication that Robinson knew much of the eastern 5,500 acres were undevelopable swamp. Third, the "investment group" was fictitious. Robert Bowen, Harold McGregor, and the Stewards testified at trial that they neither talked to Robinson about the development nor authorized him to represent them. Fourth, Robinson knew, but did not disclose, that Aronoff owned the entire 12,-500 acres and planned to sell only the eastern 5,500 acres.

On June 27, 1973, a more detailed letter regarding the development of the eastern 5,500 acres was sent to Penn-Dixie.[1]

1. (Letterhead of Detroit Equity Fund, Inc.)

June 27, 1973

Mr. Jerome Castle, President
Penn-Dixie Industries, Inc.
1345 Avenue of the Americas
New York City, New York 10019
Dear Mr. Castle:

This letter concerns your 5,500 acres of land in Putnam County, Florida. Subsequent to your meeting with Mr. Arnold Aronoff, a participant in our proposed group in connection with this property, it was suggested to me that I outline in letter form our ideas in some detail.

We intend to form a partnership for the purpose of entering into the proposed transaction as outlined below. The general partner will be a corporation to be formed with a beginning net worth in excess of one million dollars. This corporation will have overall charge of the management, direction and policy to be followed in this development. It will be staffed by personnel having extensive experience in development, construction and financing of this type of project. Final selection of these persons is almost at hand. Therefore, it will be possible to supply you with a list of these individuals very shortly.

The funds necessary for capitalization of this corporation together with additional amounts needed for development of the property and financing of the sales program overhead will be provided by the limited partners. This group has fully adequate resources for an undertaking of this magnitude. Included in addition to Mr. Aronoff, will be Mr. Robert Rowan and Mr. William Grace, President and Chairman, respectively of the Fruehauf Corporation; Mr. Walter O. Briggs, III, Chairman of Meridian Industries; Mr. Joseph L. Hudson, III, Chairman of the Hudson Division, Dayton-Hudson Corporation; Mr. David Bernst'en, President of Dayro-Corporation, Omaha, Nebraska; Mr. Charles J. Bock, Vice-President of Erb-Restrick-Bock Lumber Company; Mr. Harold McGregor, Director of Lear-Siegler, Inc.; and Messers. John, Joseph and Jerry Steward of Fabristeel Products and Multifastener.

We propose that you shall give us an option to purchase the subject property for a price of $1,500 per acre with the provision that all land paid for in years after the first year of this option shall be at a price reflecting an increase of $112.50 per acre per year. To keep this option in force, we would be required to purchase and pay for in full a minimum of twenty percent of the total land within eighteen months of the date of the option. Further, we would be required to complete the purchase of the entire parcel within six years from the date of this option. Prior to starting development, a master plan encompassing the entire 5,500 acres would be created and given final approval by all appropriate governmental authorities. We would then proceed to develop the land in accordance with this master plan in an orderly, logical manner so as not to impair, in any way, the value of any residual and that, in the event we should fail to meet our option requirements, would revert to you.

The type of development envisioned by us, which is consistent with the highest and best use of this property, taking into account market conditions, is a mixture of single-family retirement home sites, multiple-unit or apartment sites, recreational vehicle camp sites, and commercial property for shopping centers, etc. Our intention is to sell the retirement home sites directly to individuals. These constitute the majority of the property. Multiple sites will be sold to other builders, recreational vehicle camp sites will be sold to individuals on a condominium basis, and commercial land will be sold to other builders. We intend to sell, with recourse, the contracts that result from the sale of lots to individuals. All property sold will have first been developed with roads and utilities by us.

A part of our proposal is that your company shall share in the profit of the above-de-

Though the letter was on Robinson's company's stationery and bore the apparent manual signature of Robinson, it was dictated by Aronoff and signed by his secretary. Robinson received a copy of the letter for his file. The letter listed prominent corporate executives as members of Robinson's proposed development group. Several of the executives testified at trial that they neither talked to Robinson about the proposal outlined in the letter nor authorized the use of their names.

Robinson's involvement in the fraudulent scheme continued. He had a professional study of the development of the 5,500 acres prepared to convince Penn-Dixie's board of directors that the eastern 5,500 acres could be quickly resold at a substantial profit. Robinson's brother-in-law, Thomas Bosse, an associate of Interscience, Inc., a research and consulting firm, supervised the preparation of a "feasibility report." The feasibility report was materially false and misleading. Based upon data supplied by only Robinson, the feasibility report assumed that the eastern 5,500 acres were a rural utopia: "gently rolling with sandy hills." Penn-Dixie's projected profit from the development of the 5,500 acres exceeded $60 million. Conspicuously absent from the feasibility report were cost estimates attendant to developing swampland. Neither Robinson nor Bosse's names appeared within the feasibility report. One individual whose name was listed as providing data testified that he had not participated in the preparation of the feasibility report.

Interscience's feasibility report was completed on June 15, 1973, and transmitted shortly thereafter. Penn-Dixie's chief financial officer presented Robinson's letters and Interscience's feasibility report to Penn-Dixie's banks to obtain approval of the purchase of the eastern 5,500 acres. On August 13, 1973, Castle signed an agreement of sale to purchase the eastern 5,500 acres from "Erwin Ziegelman, Trustee." Though Ziegelman was trustee for Aronoff's trust, Castle told Penn-Dixie's board of directors that Ziegelman was trustee for the estate of an unassociated individual. Various members of Penn-Dixie's board of directors received copies of Robinson's letters and Interscience's feasibility report. Based upon such documents, on August 13, 1973, Penn-Dixie's board of directors unanimously ratified the agreement of sale. On October 9, 1973, Erwin Ziegelman, as trustee for Aronoff's trust, exercised his option and purchased the entire 12,500 acre tract for $5,700,000.

### A. Wire Fraud

On October 10, 1973, Ziegelman, as trustee, sold the eastern 5,500 acre tract to Penn-Dixie. A $1,025,000 downpayment was made by a wire transfer from a bank in New York City to Ziegelman's trust account at a bank in Detroit, Michigan. Mortgage notes were signed for the balance.

### B. Mail Fraud

In August 1973, Robinson asked his friend, Stephen Miller, for assistance in obtaining a payment from Penn-Dixie. Miller lived in Washington, D.C. and was associated with Holmes, Harmon, a real estate financing firm. Robinson told Miller that he (Robinson) had arranged for the preparation of a feasibility report for Penn-Dixie for a $34,000 fee, but that he had received only $17,000. At Robinson's request, Miller agreed to bill Penn-Dixie $17,000 for a review of Interscience's feasibility report. Miller was to keep a small fee and kick back most of the $17,000 to Robinson.

In early October 1973, Robinson asked Miller to submit his bill for reviewing Interscience's feasibility report. On October 5, 1973, Miller submitted a bill on his personal

scribed project. I believe the most expeditious way to arrive at a mutually satisfactory *percent share of the profit for you would be* as the result of a negotiating meeting attended by representatives of our group. I would be anxious to arrange such a meeting at your convenience. At that time, I would present, accompanied by a verbal explanation, a breakdown of costs, prices and profit. Please contact Mr. Aronoff or me concerning any questions that may arise.
Very truly yours,
/s/ EDWARD J. ROBINSON

**1194**

business stationery. At Robinson's direction, Miller's invoice to Penn-Dixie reflected his review of the feasibility report, an appraisal of the property, and verification of site characteristics, zoning ordinances and other governmental regulations. Miller submitted a second bill on Holmes, Harmon stationery. On November 9, 1973, Castle instructed Penn-Dixie's chief financial officer to pay Miller's $17,000 bill. A check for $17,000 was mailed to Miller. Robinson received at least $8,000 of the $17,000 paid to Miller.

### INDICTMENT

■ An indictment may not charge a single offense in several counts without violating the rule against "multiplicity." *United States v. Hairrell*, 521 F.2d 1264, 1266 (6th Cir.) *cert. denied* 423 U.S. 1035, 96 S.Ct. 568, 46 L.Ed.2d 409 (1975). Though it is often stated that the rule against multiplicity prevents the punishment provided for a single offense from pyramiding by a multi-count indictment, *United States v. UCO Oil Co.*, 546 F.2d 833 (9th Cir. 1976) *cert. denied* 430 U.S. 966, 97 S.Ct. 1646, 52 L.Ed.2d 357 (1977), "the decision as to unit of punishment is not controlled by the form of the indictment." *United States v. Mamber*, 127 F.Supp. 925, 927 (D.Mass.1955). An indictment is "duplicitous" when it joins in a single count two or more distinct and separate offenses. *United States v. Ellis*, 595 F.2d 154 (3rd Cir. 1979). "The vice of duplicity is that a jury may find a defendant guilty on the count without having reached a unanimous verdict on the commission of any particular offense," *UCO Oil, supra*, 546 F.2d at 835. The rules about multiplicity and duplicity are pleading rules, the violation of which is not fatal to an indictment. Defendant's remedy is to move to require the prosecution to elect either the count or the charge within the count upon which it will rely. 1 C. Wright, *Federal Practice and Procedure*, § 145 at 334–35 (1969). Additionally, a duplicitous or multiplicitous indictment is remediable by the court's instruction to the jury particularizing the distinct offense charged in each count in the indictment. Applying

these principles, we hold that the indictment in this case was neither multiplicitous or duplicitous.

■ Count One of the indictment in this case charged a conspiracy to commit wire and mail fraud. Counts Two and Three charged a substantive offense of aiding and abetting wire and mail fraud, respectively. Counts Two and Three incorporated by reference allegations set forth in Count One:

2. The allegations contained in Count One of this Indictment are repeated and realized as though fully set forth herein as constituting some of the means by which the defendants and co-schemers committed the offense charged in Count [Two or Three] of this indictment.

Robinson argues that the incorporation by reference violated the rule against duplicity because the conspiracy was thus charged in each of the three counts, and violated the rule against multiplicity because Counts Two and Three charged conspiracy as well as aiding and abetting. We disagree. The incorporation by reference did not charge a conspiracy in each of the three counts. The above-cited paragraph explicitly limits the purpose of the incorporation by reference to a particularization of the *means* used by Robinson, Aronoff and Castle to defraud Penn-Dixie. The decision in *United States v. Anzelmo*, 319 F.Supp. 1106 (E.D.La.1970), is not to the contrary. In *Anzelmo*, Count One of the indictment charged conspiracy. Several of the factual allegations incorporated by reference into the substantive counts stated "in furtherance of said conspiracy." The court held that the phrase "in furtherance of said conspiracy" did not suffice to charge a conspiracy in the substantive counts.

■ Robinson also erroneously argues that Counts Two and Three are duplicitous because they charge both conspiracy and substantive violations. To avoid unnecessarily complex and confusing allegations and the concomitant prejudice to Robinson of charging him with scores of substantive counts arising out of the same scheme, the indictment particularized in one count the

different acts that were part of the single scheme. As was aptly stated in *Cohen v. United States*, 378 F.2d 751 (9th Cir. 1967):

> [Count One] was not rendered duplicitous because the bill of particulars and subsequent evidence related to a series of calls, even though each might have been alleged as a separate violation. The government is to be commended rather than criticized for treating all such calls for the same purpose during a brief period as one crime subject to a single statutory penalty.

*Id.* at 754 (citations and footnotes omitted). Assuming *arguendo*, that the indictment was duplicitous and multiplicitous because Counts Two and Three in fact charged conspiracy as well as wire and mail fraud, respectively, this error was remedied prior to trial. Contrary to Robinson's argument, dismissal of the indictment is not the proper remedy. In this case, the prosecution elected to rely upon one specific wire for Count Two and one specific mailing for Count Three. Additionally, the district court clearly instructed the jury that each count of the indictment charged separate and distinct offenses of conspiracy and aiding and abetting.

## CONSPIRACY AND THE SUBSTANTIVE OFFENSES

As stated above, Robinson was indicted for conspiracy and aiding and abetting a wire and mail fraud. He argues that his acquittal on the conspiracy count necessitates reversal of his conviction for aiding and abetting. We disagree.

■■■■ Robinson contends that the indictment charged liability under the rule of law established in *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). In *Pinkerton*, a conspiracy and substantive offenses were charged. There was no evidence that Daniel Pinkerton had committed the substantive offense for which he had been convicted. *Id.* at 645, 66 S.Ct. at 1183. In affirming Pinkerton's conviction, the Supreme Court held that he was vicariously liable for the substantive offenses committed by co-conspirators during and in furtherance of the conspiracy. *Id.* at 647–48, 66 S.Ct. at 1184; *See also, Nye & Nissen v. United States*, 336 U.S. 613, 618, 69 S.Ct. 766, 769, 93 L.Ed. 919 (1949). Though a criminal defendant's acquittal on a conspiracy count necessitates acquittal for mail and wire fraud perpetrated by co-conspirators in furtherance of the conspiracy, *Pinkerton's* rule of vicarious liability is inapposite to this case. Neither the indictment, the prosecution's election to rely on a specific wire and mailing, or the district court's instructions to the jury in this case predicated Robinson's liability upon wire and mail fraud committed by Aronoff and Castle. Rather, Robinson was indicted and convicted for his own unlawful act: aiding and abetting a wire and a mail fraud. Charging Robinson as an aider and abettor merely makes him punishable as a principal for "acts which [he] assists another in performing." *Nye & Nissen*, 336 U.S. at 620, 69 S.Ct. at 770. Though there may be a substantial overlap in the proof offered to support the two charges, "it makes no difference so far as aiding and abetting is concerned whether the substantive offense is done pursuant to the conspiracy." *Id.;* *cf. United States v. Fife*, 573 F.2d 369 (6th Cir. 1976) ("the fact that the offenses charged in the substantive counts all relate to a single event which was the ultimate purpose of the conspiracy is immaterial. . . . There may be conviction and punishment both for conspiracy and aiding and abetting").

Robinson also argues that his acquittal on the conspiracy charge requires reversal on the conviction for aiding and abetting counts because hearsay evidence was used to convict him on such counts. Though the nature of the hearsay testimony to which Robinson refers is not clearly identified, during the prosecution's case-in-chief, the district court admitted into evidence testimony describing extrajudicial statements of Aronoff and Castle. It is well settled that such testimony is admissible as evidence under the co-conspirator exception to the hearsay rule. Fed.R.Evid. 801(d)(2)(E). Robinson argues his acquittal of the conspiracy charge vitiates the alleged co-con-

spirators' extrajudicial statements used as evidence against him. Absent such testimony, Robinson argues that his conviction for aiding and abetting is not supported by substantial evidence.

■ Robinson's argument erroneously equates conspiracy as a concept of substantive criminal law, with conspiracy as an evidentiary principle. *United States v. Gil*, 604 F.2d 546, 548–49 (7th Cir. 1979). Conspiracy as a crime involves preconcert and connivance, criminal intent, and an overt act. The co-conspirator exception to the hearsay rule is founded to some extent on concepts of agency. It is applicable even though no conspiracy has been charged. *United States v. Kendricks*, 623 F.2d 1165, 1168 n.5 (6th Cir. 1980). Though there is a substantial difference in the elements and burden of proof between the admissibility of extrajudicial statements by co-conspirators and the crime of conspiracy, acquittal on a conspiracy count has "evidentiary" effect. *Compare, United States v. Lucido*, 486 F.2d 868 (6th Cir. 1974) *with United States v. Vinson*, 606 F.2d 149 (6th Cir. 1979). In *Lucido,* the defendant was charged with conspiracy and a substantive offense. Testimony of an alleged co-conspirator's extrajudicial statements were introduced as evidence. Because the defendant had been acquitted of conspiracy, this Court held that the alleged co-conspirator's extrajudicial statements were admissible as evidence "only where independent evidence established *prima facie* an illegal joint venture." *Id.* at 869. *See also, United States v. Swainson*, 548 F.2d 657, 660–61 (6th Cir. 1977); *United States v. Suchy*, 540 F.2d 254, 257 (6th Cir. 1976); and *United States v. Clark*, 613 F.2d 391, 402 (2d Cir. 1979); *But see, United States v. Gil*, 604 F.2d 546 (7th Cir. 1979). In this case, Robinson's two letters to Penn-Dixie as well as his role in the preparation of the fraudulent Interscience feasibility report are "substantial evidence" independent of the inculpatory extrajudicial statements of Aronoff and Castle to support Robinson's conviction for aiding and abetting a wire and mail fraud.

## MAIL FRAUD

Robinson was found guilty of aiding and abetting Penn-Dixie's payment by mail of Stephen Miller's fraudulent $17,000 bill. He contends, however, that the payment of the $17,000 is not sufficiently related to the scheme to fraudulently induce Penn-Dixie to purchase the 5,500 acres of swampland to sustain a conviction under 28 U.S.C. § 1341 (mail fraud). We disagree. The relevant inquiry is whether the mailing was in furtherance of and for the purpose of executing the fraudulent scheme. *United States v. Maze*, 414 U.S. 395, 399–400, 94 S.Ct. 645, 648, 38 L.Ed.2d 603 (1974).

■ Robinson caused Penn-Dixie's $17,000 check to be mailed to Miller. He asked Miller to submit his invoice and told him when to do so. Penn-Dixie's payment of Miller's $17,000 invoice was an elaborate ruse to disguise payment to Robinson for his role in the overall scheme. As such, Penn-Dixie's payment of Miller's $17,000 invoice was in furtherance of and for the purpose of executing his scheme.

## IMPROPER CLOSING ARGUMENT

Robinson contends that two improper references to his failure to testify and present a defense were made by the Assistant U. S. Attorney in his closing argument and that such references singly and collectively were prejudicial. We disagree.

"Molded by the courage of Sir Thomas More, the Fifth Amendment's great protection of individual dignity assures the accused that he will not be forced to speak or jailed for silence." *Charles v. Anderson*, 610 F.2d 417, 424 (6th Cir. 1979) (Merritt, J., dissenting), *rev'd sub nom Anderson v. Charles*, 447 U.S. 404, 100 S.Ct. 2180, 65 L.Ed.2d 222 (1980). Fulfillment of this high purpose requires that counsel confine argument to discussion of the facts disclosed by the evidence and legitimate inferences therefrom. The relevant principles to distinguish proper argument from improper comment on a criminal defendant's exercise of constitutional rights may be gleaned from well established precedent.

 A prosecutor abrogates a criminal defendant's Fifth Amendment right to remain silent by referring to the evidence against him as "uncontradicted," when only the defendant could have been called to contradict the evidence. *United States v. Handman*, 447 F.2d 853 (7th Cir. 1971); *See also, United States v. Lyons*, 397 F.2d 505 (7th Cir.) *cert. denied* 393 U.S. 846, 89 S.Ct. 131, 21 L.Ed.2d 117 (1968); *But see, United States v. Estrada de Castillo*, 549 F.2d 583, 584 n.1 (9th Cir. 1976). Reference to the state's evidence as "uncontradicted" is proper where the defendant's own counsel clearly focused the jury's attention on [his] silence by outlining a contemplated defense in opening statement and by stating that the defendant would be a witness. *Lockett v. Ohio*, 438 U.S. 586, 595, 98 S.Ct. 2954, 2960, 57 L.Ed.2d 973 (1978). Evidence may be characterized as "unimpeached" only to focus attention on impeachment by actual cross-examination rather than contradiction by some other witness. However, as was aptly stated in *United States v. Hooker*, 541 F.2d 300 (1st Cir. 1976):

> A prosecutor who attempts to define exactly the line between proper comment on ... impeachment by cross-examination and improper comment on failure of accused to testify *or present a defense* does so at his peril.

(emphasis added) *Id.* at 307; *See also, United States v. Goldman*, 563 F.2d 501, 505 (1st Cir. 1977). This is particularly true because, in the exercise of our supervisory powers over federal criminal procedures, this Circuit has held that a prosecutor's comments "may not have the effect of shifting the burden of proof from the government to the defendants or abrogating the presumption of innocence to which [defendants] are entitled." *United States v. Smith*, 500 F.2d 293 (6th Cir. 1974). Applying these principles, we hold that the prosecutor neither improperly commented on Robinson's failure to testify nor abrogated the presumption of innocence to which he was entitled.

 To reverse a conviction for improper comment on the criminal defendant's Fifth Amendment right to remain silent,

"we must find one of two things: that 'the prosecutor's' manifest intention was to comment upon the accused's failure to testify or that the remark was 'of such a character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify.'" *United States v. Rochan*, 563 F.2d 1246, 1249 (5th Cir. 1977); *United States v. Wells*, 431 F.2d 434, 435 (6th Cir. 1970), *cert. denied*, 400 U.S. 997, 91 S.Ct. 475, 27 L.Ed.2d 448 (1971). "We cannot find that the prosecutor manifestly intended to comment on the defendant's failure to testify if some other explanation for his remark is equally plausible." *Rochan, supra*, at 1249. Whether the jury "necessarily construes" a prosecutor's remark as a comment on a defendant's failure to testify requires a probing analysis of the context of the comment, and the likely effect of the district court's curative instruction, if any.

Both of the prosecutor's comments occurred in connection with the prosecutor's discussion of Robinson's role in instigating Miller to bill Penn-Dixie $17,000 for services he never rendered. The first statement was as follows:

> You should think to yourself what is Mr. Robinson's defense to this whole thing? What does he claim really happened? Now right to this moment, despite the lengthy cross-examination ... I suspect I will suggest to you don't even know what the claim of innocence is because there has never been any evidence, any real concrete suggestion even as to the innocent explanation as to what happened with respect to that bill.
>
> [Defense counsel's] opening, he talked for an hour, he didn't mention Stephen Miller's name. He didn't refer to that ...

In his second comment, the prosecutor stated:

> ... most of all, listen to what [defense counsel] says to you about Mr. Miller's testimony and all of the documents I have gone through with you, because I would suggest to you as of now, there has been no argument even as to how in any way that could be legitimate, and I would

also suggest to you that there *has been no evidence*, not even that much, as to how that could have been legitimate . . .

 We cannot find that the prosecutor manifestly intended, or that the jury would have necessarily construed the prosecutor's remarks, to comment on Robinson's failure to testify. It is equally plausible that the comments focused the jury's attention on the fact that Miller's credibility was unimpeached despite extensive cross-examination by Robinson's counsel. Thus, when viewed in this light, the prosecutor was asking the jury to find that Robinson initiated Miller's fraudulent bill to Penn-Dixie, a fact crucial to convict Robinson of mail fraud.

Nor do we believe that the prosecutor's comments were improper because they "had the effect of shifting the burden of proof from the government to the defendant and abrogating the presumption of innocence." *U. S. v. Smith, supra*, at 294. In *Smith*, a criminal conviction was reversed because the prosecutor stated:

> If there is any other reasonable explanation of the meaning of these calls other than what I have suggested the meaning, because if there is, in each and every instance . . . *I would ask that the defendants satisfy you that there is no other reasonable explanation.*
>
> If they have some reasonable alternatives to suggest as to what the calls mean, then I leave with you now, *you then require them to show that to you.*

*Id.* at 255 (emphasis added). In this case, the prosecutor's remarks that "what is Mr. Robinson's defense to this whole thing," "You don't know what the claim of innocence is," and "There has been no evidence . . . as to how [Miller's bill] could have been legitimate" are perilously close to the improper remarks in *Smith*. However, we hold that the prosecutor's remarks were not clearly improper.

Robinson's counsel's lengthy and descriptive opening statement to the jury specifically represented that Robinson and others would testify in his behalf and recited many of the facts such testimony would establish.

At the close of the prosecution's case-in-chief, Robinson's counsel rested. Though not every opening statement which represents that a defendant will testify and present other evidence in his own behalf permits a prosecutor to comment on defendant's failure to produce this evidence, Robinson's counsel clearly focused the jury's attention on Robinson's silence and absence of any defense. *Lockett v. Ohio, supra.*

Accordingly, the judgment of the district court is AFFIRMED.