ambiguity and, indeed, may support the theory that Hood acted with intent to frighten.  The fact that Bolz and Swinson did not request assistance immediately after the encounter, for example, might suggest that the inspectors themselves did not perceive Hood as a serious threat to their physical safety. Similarly, Hood's attempt to register a complaint against the inspectors seems inconsistent with an intent to harm them. Taken as a whole, the record before this court does not contain evidence sufficient to support the conclusion that Hood acted with intent to injure the inspectors.  I therefore agree with the majority that the case should be remanded for resentencing pursuant to the minor assault characteristic, U.S.S.G. § 2A2.3.

*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION:  2000 FED App. 0149P (6th Cir.)
File Name:  00a0149p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

————————



UNITED STATES OF AMERICA,
    *Plaintiff-Appellee,*

        *v.*                                      No. 99-3932

JANNIE L. SHUMPERT HOOD,
    *Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Ohio at Akron.
No. 99-00025—James S. Gwin, District Judge.

Argued:  December 6, 1999

Decided and Filed:  April 27, 2000

Before:  JONES, BATCHELDER, and MOORE, Circuit
Judges.

————————

### COUNSEL

**ARGUED:**   John F. McCaffrey, McLAUGHLIN & McCAFFREY, Cleveland, Ohio, for Appellant.  Steven L. Jackson, ASSISTANT UNITED STATES ATTORNEY, Cleveland, Ohio, for Appellee.  **ON BRIEF:**  John F. McCaffrey, McLAUGHLIN & McCAFFREY, Cleveland, Ohio, for Appellant.   Steven L. Jackson, ASSISTANT

UNITED STATES ATTORNEY, Cleveland, Ohio, for Appellee.

JONES, J., delivered the opinion of the court, in which MOORE, J., joined. BATCHELDER, J. (pp. 9-12), delivered a separate concurring opinion.

———————————

**OPINION**

———————————

NATHANIEL R. JONES, Circuit Judge.    Defendant-Appellant Jannie Shumpert Hood appeals her conviction and sentence for assault of a federal postal officer in violation of 18 U.S.C. §§ 111(a)(1) & (b). Hood contends that the district court erred by not specifically instructing the jury on Sixth Amendment unanimity, and by sentencing her under U.S.S.G. § 2A2.2 for "aggravated assault." We disagree with her first contention, but agree that the district court erred in sentencing her under § 2A2.2. Accordingly, we **AFFIRM** in part, **VACATE** in part, and **REMAND** for re-sentencing.

**I.**

The question of determining the appropriate classification of assault in this case is particularly fact-driven, as will be evident from the following recital of events. On January 12, 1999, Mrs. Hood, a 47 year-old African-American, was at her home in Cleveland's Collinwood section. Sometime that morning, Jim Wacker, a nineteen year old recent high school graduate, came by to deliver the mail. Appellant Hood met Wacker as he arrived to deliver the mail. Wacker testified that he "backed up" when he saw the appellant open the door, as it made him "nervous" that a black woman he did not know was coming outside. J.A. at 104-05. Appellant, upset that her mail was not being delivered as she desired, snatched the mail out of Wacker's hands. After an angry exchange of words, Wacker promptly reported the incident to his supervisor, whereupon the supervisor dispatched Inspectors Steven Bolz and J.C. Swinson to probe the incident.

LeRoy, but he did not arrive before the inspectors had retreated to their van and driven away. Hood testified that she never stepped out onto the porch, and that she did not threaten the inspectors with the knife.

By all accounts, Swinson and Bolz did not radio for backup or request assistance from the police. Hood, by contrast, called the post office to office to register a complaint against the person who had called the postal inspectors on her. Hood indicated that "They were coming to murder me." Later that afternoon, Hood went to the post office to complain in person. The following day, January 13, 1999, Hood was arrested.

Hood was charged with two counts of forcibly assaulting, resisting, opposing, impeding, intimidating, or interfering with a federal official engaged in the performance of his duties, in violation of 18 U.S.C. § 111. A jury acquitted Hood of the count with respect to letter carrier Wacker, thus indicating that they had at least a reasonable doubt about Wacker's version of the event. The jury convicted Hood of the count with respect to Bolz and Swinson, indicating that they credited the inspectors' testimony over that of Hood.

**II**

Hood was properly sentenced pursuant to the aggravated assault offense characteristic, U.S.S.G. § 2A2.2, only if she acted "with intent to do bodily harm (*i.e.* not merely to frighten)." U.S. Sentencing Guidelines Manual § 2A2.2 comment. app. n.1. I cannot agree with the majority that there is an "absolute paucity" of evidence that Hood acted in such a fashion. The credited testimony in this case is that Hood barreled through her front door and held a knife approximately one foot away from inspector Swinson's face. This is a non-trivial piece of evidence.

Viewed in isolation, however, this evidence is equivocal. Hood may have rushed through the door with a knife in her outstretched hand intending to injure the inspectors, or she may have wanted merely to frighten them off her porch. The remaining evidence of record does little to clarify the

After this incident, Wacker radioed his supervisor and reported that he had been assaulted. The Post Office dispatched two postal inspectors, Stephen Bolz and Jean Swinson, to investigate.

According to the inspectors, they first found James Wacker and obtained his account of his encounter with Hood. They then went to Hood's house, where, upon arrival, they knocked on the door and rang the doorbell. After some delay, Hood appeared at a window. The inspectors identified themselves. After further delay, Hood opened the door, rushed out, and held a steak knife six to twelve inches away from Swinson's face. Hood appeared to be very angry and said, "I didn't call you. Get off my porch." The inspectors backed off the porch.

Once he was off the porch, Bolz, for the first time in a thirteen-year career in law enforcement, drew his service revolver. Bolz would later testify that this "was a defensive reaction to what I felt was a dangerous situation." Hood saw the weapon and began to yell, "He's got a gun. He's going to shoot me." The inspectors retreated to their vehicle and drove back to the post office.

Hood's account of this episode, once again, differs significantly. Hood testified that after the inspectors had rung the doorbell, she went to the window and tapped on it. In response, Swinson "stuck her head around," allowing Hood to see her. Hood proceeded to the door while still holding a knife that she had been using to prepare breakfast. She opened the door and, for the first time, Swinson displayed her credentials. The inspectors said nothing, however. Because they remained silent, Hood, after several moments, told them to get off her porch. The inspectors went down the steps, and Bolz pulled back his coat, revealing his gun. The gun looked like it was pointing at Hood. Hood summoned her nephew[1]

---

[1]According to Inspectors Bolz and Swinson, Ms. Hood was yelling for someone named "Danny," and shouting that the inspectors were going to shoot her. Ms. Hood, however, testified that she called for her nephew, "LeRoy," saying merely, "LeRoy, come here."

Bolz and Swinson arrived at Hood's home while she was in the middle of preparing breakfast for her nephew. The record shows that after Bolz and Swinson arrived on the porch and rang the doorbell, Mrs. Hood looked out the window to see who was at the door. Upon observing Bolz and Swinson, Mrs. Hood went to the door while still holding the knife she used to prepare breakfast. The inspectors testified that when Mrs. Hood came to the window, they displayed their credentials prior to her coming outside onto the porch. The porch was very small, approximately the same width as Appellant's storm door. It was supported by a pillar that, given the porch's small size, prevented the door from fully opening. Thus, anyone standing to the left side of the porch, as was Bolz, would be blocked behind the door and pillar.

Mrs. Hood testified that she first noticed Swinson's credentials when she opened the door. While Appellant stated that she merely opened the doors, Swinson testified that Mrs. Hood came "barreling out" of the house. Bolz stated that she came out of the house "very loud and angry." J.A. at 132-33. In any event, when Bolz noticed that she had a steak knife in her hand, he backed off the porch, as did Swinson, and drew his firearm on Appellant. Seeing the weapon, she began screaming to her nephew, "Danny, he's got a gun. He's going to shoot me." The inspectors quickly backed away from the house, and returned in their unmarked van to the Collinwood post office. Mrs. Hood called the station to register a complaint, and, later in the day, personally went to the station to complain about the incident.

On February 10, 1999, a federal grand jury returned a three count indictment against Appellant Hood, alleging three separate individual assaults against Bolz, Swinson, and Wacker in violation of 18 U.S.C. § 111(a) & (b). The Bolz and Swinson counts alleged that Hood committed the assault through the use of a deadly weapon in violation of § 111(b). On March 30, 1999, Appellant moved to compel election between multiplicitous counts, asserting that the separate Bolz and Swinson charges actually constituted a single act of assault. J.A. at 23. The Government did not object to this

motion, and a superseding two count indictment was subsequently issued on April 14. Count one of the superseding indictment collapsed the charges against Bolz and Swinson into one collective charge, while count two, the Wacker charge, remained unchanged from the initial indictment.

During the two-day trial, Mrs. Hood requested a specific unanimity instruction, requiring the jury to unanimously find that she assaulted both Swinson and Bolz to convict. The Court denied this request, and instructed the jury that it could convict if it found that Mrs. Hood "forcibly assaulted or resisted or opposed or impeded or intimidated or interfered with J.C. Swinson *or* Steven D. Bolz." J.A. at 227 (emphasis added). The jury subsequently convicted Hood of count one, and acquitted her on count two. The probation officer's pre-sentencing report provided that Hood never "lung[ed] forward" with the knife, but that she "did advance toward [Bolz and Swinson] on the porch." The district court applied the guideline provision for "aggravated assault," increased the base offense level by three for brandishing or threatening the use of a deadly weapon, and sentenced Appellant to 27 months imprisonment. Hood filed this timely appeal, contending that the district court erred both in failing to cure a purportedly duplicitous indictment and in sentencing her under the "aggravated assault" guideline.

## II.

"The trial court is 'vested with broad discretion in formulating its charge and will not be reversed unless the charge fails accurately to reflect the law.'" *United States v. Busacca*, 863 F.2d 433, 435 (6th Cir. 1988) (per curiam) (citation omitted). Accordingly, we review the trial court's jury instruction for an abuse of discretion. *Id.* Raising a mixed question of law and fact, we review *de novo* the district court's application of U.S.S.G. § 2A2.2.

---

----

## CONCURRENCE

----

ALICE M. BATCHELDER, Circuit Judge, concurring. I concur in the majority's disposition of this case. I write separately to highlight some facts material to and necessary for an understanding of both the charges against the defendant and the § 2A2.2 sentencing issue that did not find their way into the majority opinion.

### I

On January 12, 1999, substitute letter carrier James Wacker arrived at 888 E. 139th Street, the Collinwood home of Jannie L. Shumpert Hood. Hood is a forty-eight-year-old African-American woman with a history of mental illness. Due to mail theft problems, Hood had installed a lock on her mailbox. A diagram on the mailbox instructed postal workers how Hood wished her mail to be delivered.

According to Wacker, as he was preparing to deliver Hood's mail, Hood exited her house and began yelling that he was putting the mail in the wrong place. Hood snatched the mail from him and demanded to know his name. At some point during the encounter, Wacker testified, Hood shoved him. Wacker testified that he was frightened and nervous, and he therefore did not tell Ms. Hood his true name. Hood threatened to call the post office, prompting Wacker to give his correct name.

Hood's rendition of the events differs considerably. According to Hood, she came out of the house and Wacker handed her the mail. She inquired if Wacker would be her regular letter carrier and, receiving a negative response, asked his name. Wacker gave a false name. Sensing the deception, Hood said, "Oh, you are lying," and ordered Wacker off her porch. As he left, Wacker stated his true name. Hood denies ever having shoved Wacker.

in applying that provision. Given these facts and the expansive definition of § 2A2.3 "minor assault" as "a felonious assault not covered by § 2A2.2," we conclude that § 2A2.3 is the guideline provision "most applicable" to Hood's conduct.

## III.

Because we do not deem the district court's jury instruction erroneous, but do conclude that it erred in sentencing Appellant under U.S.S.G. § 2A2.2, we **AFFIRM** her conviction but **VACATE** her sentence. Accordingly, we **REMAND** for re-sentencing in accordance with U.S.S.G. § 2A2.3.

---

### A.

Duplicitous indictments implicate the protections of the Sixth Amendment guarantee of jury unanimity. An indictment is duplicitous if "it joins in a single count two or more distinct and separate offenses." *United States v. Robinson*, 651 F.2d 1188, 1194 (6th Cir. 1981). "The vice of duplicity is that a jury may find a defendant guilty on the count without having reached a unanimous verdict on the commission of any particular offense." *Id.* (citation omitted); *see also United States v. Washington*, 127 F.3d 510, 513 (6th Cir. 1997). By collapsing separate offenses into a single count, duplicitous indictments thereby prevent the jury from convicting on one offense and acquitting on another. *See id.* Duplicitous charges, however, are not necessarily fatal to an indictment. *See Robinson*, 651 F.2d at 1194. A defendant may move, as did Hood, to require the government to "elect either the count or the charge within the count upon which it will rely," or the court may "particulariz[e] the distinct offense charged in each count" in its jury instruction. *Id.* Moreover, a specific unanimity instruction is generally not required unless: "1) a count is extremely complex; 2) there is variance between the indictment and the proof at trial; or 3) there is a tangible risk of jury confusion." *United States v. Sanderson*, 966 F.2d 184, 187 (6th Cir. 1992).

Additionally, a single act of assault against multiple officers constitutes one offense, and therefore does not implicate Sixth Amendment prohibitions on duplicity. *See Ladner v. United States*, 358 U.S. 169, 176 (1958) (holding, under the predecessor of § 111, that two federal officers wounded by a single shot constituted a single assault); *United States v. Beckner*, 983 F.2d 1380, 1386 n.1 (6th Cir. 1993) (asserting that we cannot separately sentence defendants for injuring multiple federal officers when injuries are caused by single act); *United States v. Theriault*, 531 F.2d 281, 285 (5th Cir. 1976) ("The test is whether there is more than one act resulting in the assaults, not whether more than one federal officer is injured by the same act."). In differentiating whether an attack against multiple officials is a single assault

or multiple assaults, federal courts have inquired whether officers were injured by "distinct successive criminal episodes, rather than two phases of a single assault." *United States v. Segien*, 114 F.3d 1014, 1022 (10th Cir. 1997) (internal quotations and citation omitted); *accord United States v. Lewis*, 435 F.2d 417, 420 (D.C. Cir. 1970) (citation omitted).

Appellant Hood contends that her alleged conduct constituted "two separate and distinct offenses under 18 U.S.C. § 111." It is on this presupposition that she asserts that in instructing the jury it could convict if she assaulted Swinson *or* Bolz, the district court allowed the jury to convict without the unanimity required by the Sixth Amendment. We conclude, however, that the district court did not abuse its discretion in instructing the jury it could convict on the basis of a single assaultive event. In *Ladner*, the Supreme Court held that a defendant committed a single act of assault, as opposed to multiple separate assaults, when he fired a single shot from a shotgun and wounded two officers. *See* 358 U.S. at 176. Even more similar to this case is the D.C. Circuit's holding in *Lewis*. While both officials were actually wounded in *Ladner*, in *Lewis*, the defendant fired one shot at two officers, and missed both of them. *See* 435 F.2d at 419. The court held that this conduct constituted a single assaultive act, rather than individual assaults against each officer. *See id.*

Similarly, here, there was only one assaultive event. Bolz conceded that Hood did not lunge at him or Swinson, and there is no evidence that she made any aggressive or threatening statements toward either of them. Moreover, Hood has not pointed the court to any separate acts that could plausibly imply two "distinct successive criminal episodes ."

**B.**

The first step in applying the guidelines is to "[d]etermine the applicable offense guideline section" found in "Statutory Index (Appendix A)," which is designed to "assist" in determining the guideline provision applicable to particular criminal conduct. U.S.S.G. § 1B1.1(a); *see United States v.*

*Winters*, No. 94-4269, 1995 WL 462415 (6th Cir. 1995) (unpublished per curiam). The index provides the guideline section "ordinarily applicable" to the convicting statute; however:

> [i]f, in an atypical case, the guideline section indicated for the statute of conviction is inappropriate because of the particular conduct involved, use the guideline section most applicable to the nature of the offense conduct charged in the count of which the defendant was convicted.

U.S.S.G., app. A.

The guidelines indicate that §§ 2A2.2 and 2A2.4 are the provisions "ordinarily applicable" to convictions under 18 § U.S.C. § 111. Even though the presentence investigation report concluded that § 2A2.2, covering aggravated assaults, might be "excessive for the circumstances of this case," the district court nevertheless applied § 2A2.2, stating that it made "its finding in reliance upon the statutory index." "Aggravated assault" under § 2A2.2 is defined as follows:

> [A] felonious assault that involved (A) a dangerous weapon with intent to do bodily harm (i.e. not merely to frighten), or (B) serious bodily injury, or (C) an intent to commit another felony.

U.S.S.G. § 2A2.2 comment. (n.1). Correspondingly, the § 2A2.3 guideline for "minor assault" is explicitly defined as "a felonious assault not covered by § 2A2.2." U.S.S.G. § 2A2.3 comment. (n.1).

Given the absolute paucity of evidence that Mrs. Hood had an intent to do bodily harm, or commit another felony, we must conclude that the district court erred in applying the "aggravated assault" guideline. Mrs. Hood made no verbal threats or statements that she intended to do the postal workers any harm, and Bolz conceded that Appellant did not lunge at them with the knife. This record does not support the application of § 2A2.2, and the district court therefore erred