**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 05a0272n.06
Filed: April 11, 2005

**Case Nos. 02-5854; 02- 6229; 02-6232**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff-Appellee,** | ) | **ON APPEAL FROM THE UNITED** |
| | ) | **STATES DISTRICT COURT FOR** |
| | ) | **THE EASTERN DISTRICT OF** |
| **v.** | ) | **KENTUCKY** |
| | ) | |
| **JOHNNY LEE BULLOCK,** | ) | |
| **TROY KIRBY, and** | ) | |
| **PHILLIP KIRBY,** | ) | |
| | ) | |
| **Defendants-Appellants.** | ) | |

**BEFORE:  BOGGS, Chief Judge; GILMAN, Circuit Judge; and SARGUS, District Judge.***

**SARGUS, District Judge.**    Phillip Kirby appeals his conviction and sentence

following a guilty plea to manufacturing methamphetamine. Co-defendants Troy Kirby and Johnny

Lee Bullock appeal their jury convictions and sentences for conspiracy to manufacture and

manufacturing of methamphetamine (Kirby), conspiracy to possess and possession with intent to

distribute methamphetamine (Bullock), and possession of firearms by a convicted felon and

possession of unregistered firearms (Kirby).  For the reasons that follow, the district court is

affirmed in all respects, but the cases are remanded for resentencing in light of *United States v.*

---

*The Honorable Edmund A. Sargus, Jr., United States District Judge for the Southern District of
Ohio, sitting by designation.

*Booker*, 125 S.Ct. 738 (2005).

**I.**

On July 26, 2001, Appellants Phillip Kirby, Troy Kirby and Johnny Lee Bullock, along with seven other individuals, were charged in a twenty-four count superseding indictment involving methamphetamine manufacturing and trafficking in and around the area of Rockcastle County, Kentucky. Each of the Appellants was charged in Count 1 with conspiracy to manufacture over 500 grams of methamphetamine in violation of 21 U.S.C. § 846, and in Count 2 with conspiracy to possess with intent to distribute over 500 grams of methamphetamine in violation of 21 U.S.C. § 846. Phillip Kirby entered into a plea agreement with the United States. Troy Kirby and Bullock proceeded to trial.

**Johnny Lee Bullock**

Bullock was also charged with three counts of possessing with intent to distribute methamphetamine in violation of 21 U.S.C. § 841(a)(1) (Counts 12, 15 and 16). At trial, the jury found Bullock guilty of four of the five counts against him (Counts 2, 12, 15 and 16).

During the trial, the government sought to introduce two audio tape recordings against Bullock. The government indicated that both tapes related to drug deals negotiated by Bullock. The district court determined that "Tape 2" was inaudible and thus inadmissible. The court determined that the voices on "Tape 1" were sufficiently distinct to allow identification. Tape 1, therefore, was played to the jury and admitted into evidence.

The jury found Bullock guilty on Count 12, among others, which specifically related to the December 7, 2000 drug deal depicted on Tape 1. This tape contained two voices, one of Stacy

Crain who was deceased at the time of trial.[1]  A witness during trial identified the other voice on the tape as belonging to Bullock.

The district court sentenced Bullock to two hundred thirty-five (235) months of imprisonment on each of the four counts, to run concurrently, and to five years supervised release.  Bullock raised two objections during the sentencing hearing.  First, Bullock contended that the probation office had made a finding of the amount of methamphetamine which was inconsistent with the amount found by the jury.  Bullock argued that the jury found that he was responsible for between five (5) and fifty (50) grams of methamphetamine, or between fifty (50) and five-hundred (500) grams of a mixture containing a detectable amount of methamphetamine.  The probation office found that Bullock was responsible for between 159.55 to 1389.8 grams of methamphetamine. This determination placed Bullock at an offense level 32 rather than between a level 26 and 30.  Because the probation officer's assessment, and the district court's subsequent determination regarding the amount of methamphetamine increased Bullock's penalty beyond the amount found by the jury, Bullock objected that the sentence violated *Apprendi v. New Jersey*, 530 U.S. 466 (2000).

The district judge granted Bullock's motion to exclude a previous criminal conviction from Jackson County that was not properly documented.  The district judge then determined that Bullock's criminal history was under-represented and granted the government's motion for an upward departure.  The court therefore increased Bullock's criminal history category from a III to a V under the United States Sentencing Guidelines ("U.S.S.G.").

---

[1]The district court determined that a statement given to the police by Stacy Crain prior to her death regarding the alleged drug deal was inadmissible.

**Troy Kirby**

Troy Kirby was also charged with three counts of attempting to manufacture methamphetamine in violation of 21 U.S.C. § 846 (Counts 7, 17 and 21); possessing a firearm after having been convicted of a felony crime in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2) (Count 8); possessing an unregistered firearm in violation of 26 U.S.C. §§ 5861(d) and 5845(a)(1) (Count 19); and forfeiture of assets (Count 24).

The record reflects that a Kentucky state police trooper observed Kirby run a red light on September 5, 2000. The police officer made a traffic stop and issued a warning to Kirby for driving on a suspended license. On October 7, 2000, the same trooper observed Kirby operating the same car. The police officer stopped and arrested Kirby, who was still driving with a suspended license. During the search of the car, the police found three (3) one-ounce bags of marijuana, a rock of methamphetamine, and a firearm.

On November 19, 2001, the district court, through a magistrate judge, conducted a suppression hearing on Troy Kirby's motion to exclude evidence obtained by law enforcement officers during the execution of search warrants on October 11, 2000 and February 12, 2001. On November 21, 2001, the magistrate judge issued a report and recommendation, which concluded that the district court should deny Troy Kirby's motion to suppress on all grounds. The district judge adopted the report and recommendation of the magistrate judge on December 7, 2001, over Kirby's objection.

During the trial, Troy Kirby stipulated that he had a prior felony conviction and that his prior conviction prohibited him possessing a firearm. At trial, the jury returned a verdict of guilty on Counts 1, 2, 7, 8, 17 and 19. As to Counts 1, 2, 7 and 17, the jury found that Troy Kirby was

responsible for fifty (50) grams or more of methamphetamine, or 500 grams or more of a mixture containing a detectable amount of methamphetamine.

**Phillip Kirby**

Phillip Kirby, along with his sister, Jennifer Kirby, were charged with aiding and abetting in attempting to manufacture methamphetamine in violation of 21 U.S.C. § 846 (Count 11); possession with intent to distribute sixty capsules of Tylox in violation of 21 U.S.C. § 841(a)(1) (Count 20); and forfeiture of $1,788.00 seized from Phillip Kirby when he was arrested. (Count 23)

On December 10, 2001, pursuant to a written plea agreement, Phillip Kirby pled guilty to the offenses charged in Count 11 and agreed not to contest the forfeiture allegations in Count 23. The United States agreed to dismiss the remaining counts. In paragraph 8 of the plea agreement, the United States agreed, pursuant to U.S.S.G. § 1B1.3, that Kirby's relevant conduct would include 339.82 grams of a mixture containing methamphetamine. Phillip Kirby did not testify in or observe the trial of the defendants who did not enter pleas.[2]

The United States Probation Office prepared a Presentence Report that recommended that Kirby's offense level be enhanced by two levels under U.S.S.G. § 3B1.1 as a leader or an organizer.

---

[2]Paragraph 4(b) of the plea agreement described the factual basis of Phillip Kirby's plea:

That on or about October 17, 2000, in Rockcastle County, in the Eastern District of Kentucky, the defendant, Phillip Kirby, Jennifer Kirby, made a substantial step toward manufacturing the methamphetamine by recruiting Cherie Lynne McHargue, and Jarrod Lynn Singleton, to help them obtain listed chemicals, namely, ephedrine, tablets. The four traveled in Jennifer Kirby's vehicle from Mt. Vernon, in Rockcastle County, Eastern District of Kentucky to other parts of Kentucky including Berea, Richmond, Lexington, and Dry Ridge, Kentucky purchasing approximately 52 boxes of equate tablets, 600 ephedrine tablets, as well as, lithium batteries, camping fuel, and strainers. Officers at Dry Ridge, stopped Phillip Kirby as he exited the Walmart store with a bag containing part of the above mentioned supplies.

(Plea Agmt., J.A. at 261.)

Kirby objected to the recommended enhancement, contending that the facts of the case, including the dismissal of Counts 1 and 2 of the indictment which accused Kirby of a wide-ranging conspiracy that continued for over one year and involved over 500 grams of methamphetamine, established that an upward adjustment for Kirby's role in the offense conduct underlying Count 11 was inappropriate.

The district court held a sentencing hearing on June 10, 2002. At the sentencing hearing, the United States argued in support of the enhancement and relied on trial testimony in making its arguments. Kirby expressly objected to the United States' arguments, contending that the government had violated its plea agreement with Kirby by arguing in support of the leader-and-organizer enhancement. The court adopted the recommendation of the Probation Office and found that Kirby's sentence was properly enhanced under U.S.S.G. § 3B1.1. The district court sentenced Kirby to ninety-four (94) months of imprisonment.

## II.

The district court had jurisdiction pursuant to 18 U.S.C. § 3231 because Johnny Lee Bullock, Phillip Kirby and Troy Kirby were charged with offenses against the laws of the United States. This Court has jurisdiction over the appeals of Johnny Lee Bullock, Phillip Kirby and Troy Kirby under 28 U.S.C. § 1291. The Court also has jurisdiction over Johnny Lee Bullock's and Phillip Kirby's appeals pursuant to 18 U.S.C. § 3742(a)(2).

## III.

### A.    Johnny Lee Bullock

#### 1.    Admission of Audio Tape Into Evidence

Bullock contends that his conviction must be reversed because the trial court admitted into

evidence an inaudible audiotape recording of an alleged drug buy with which he was allegedly involved. Although she did not have a transcript of the conversation, the trial judge listened to the tape and determined that it was audible and admitted it into evidence.

We review the decision of the district court to admit the audiotape recording for abuse of discretion. *United States v. Robinson*, 707 F.2d 872, 875 (6th Cir. 1983). The United States, however, maintains that Bullock waived any challenge as to whether the January 7 tape was audible and in fact conceded that the tape recording was comprehensible. The government argues that Bullock may not now take a different position on appeal. If Bullock waived his objection to the admission of the tape as the government contends, this Court reviews the introduction of evidence to determine if it constitutes plain error and affects a party's substantial rights. Fed. R. Evid. 103(d).

A defendant waives a claim when he agrees with the district court's course of conduct and may not charge the lower court with error in following that course. *United States v. Aparco-Centeno*, 280 F.3d 1084, 1088 (6th Cir. 2002). In this case, after listening to the enhanced version of the audio tape recordings at issue in this case, Bullock's counsel agreed that the "first tape," which involved the January 7 drug deal, was audible. ("On the first tape, I hear a drug deal go down." (J.A. at 439-40.)) The trial court confirmed Bullock's concession. ("I think what Mr. White says as to audibility is he can hear a drug deal go down on the first one. On the second one he says he couldn't hear a drug deal go down. And, frankly, neither could I." (J.A. at 440.))[3]

_____

[3]Bullock argues that the trial judge, after ruling on the admissibility of the tape, seemed to indicate that it was inaudible. During a side bar in which counsel were discussing the facts surrounding the alleged drug buy between Stacy Crain and Bullock, counsel for Bullock indicated that "the tape speaks for itself on that," to which the trial judge said that she could not understand "that" tape. (J.A., at 825.) The record does not bear out Bullock's argument that the trial judge was indicating that the tape she had previously admitted was unintelligible. Instead, when Bullock's counsel indicated that he was referring to the first tape, as opposed to the second which the court had previously ruled was inadmissible, the trial judge acknowledged her understanding. Read in its entire context, the trial judge was referring to

Bullock's counsel argued only that the tape recording was irrelevant and that Bullock's voice was not on the tape, notwithstanding the government's assertion that witnesses would identify Bullock's voice. As such, Bullock has waived his claim that the tape was inaudible.[4]

Even if Bullock had not waived his claim, the trial court did not err in admitting the tape recording of the January 7 drug transaction. In order for a tape recording to be admissible at trial, the tape must be audible and sufficiently comprehensible for the jury to consider its contents. *Robinson*, 707 F.2d at 875.

> The admission at trial of tape recordings rests within the sound discretion of the trial court. . . . The fact that a tape recording has some unintelligible portions does not automatically render the entire recording inadmissible. For the tape to be inadmissible, the incomprehensible portions must be so "substantial as to render the recordings as a whole untrustworthy."

*United States v. Wilkinson*, 53 F.3d 757, 761 (6th Cir. 1995)(quoting *United States v. Robinson*, 763 F.2d 778, 781 (6th Cir. 1985) (internal citations and quotations omitted)). The court should predetermine whether unintelligible portions of the tape render the whole recording untrustworthy. *United States v. King*, 272 F.3d 366, 374 (6th Cir. 2001).

Bullock maintains that the tape was inadmissible because it was not accompanied by a transcript. In *Robinson*, the Court set out the following guidelines for the use of transcripts:

> [I]n the absence of a stipulation, we hold that the transcriber should verify that he or she has listened to the tape and accurately transcribed its content. The court should also make an independent determination of accuracy by reading the transcript against the tape. Where, as here, there are inaudible portions of the tape, the court should direct the deletion of the unreliable portion of the transcript. This, however, assumes that the court has predetermined that unintelligible portions of the

---

the tape she had previously suppressed when she said she could not understand "that" tape. She did not say that the first tape, which she admitted into evidence, was inaudible.

[4]Additionally, during an objection to the admission of other evidence in the case, Bullock's attorney argued that the tape recording at issue was "clear," and "probative." (J.A. at pp. 851-52, 858.)

tape do not render the whole recording untrustworthy.

707 F.2d at 876.

In this case, Bullock has not established or even argued that the tape was incomprehensible as a whole. The district court listened to the tape and determined that it was sufficiently comprehensible for the jury to hear. The government had a witness testify as to the voices on the tape and identified Bullock as a speaker. In fact, Bullock's counsel made several references to the tape during the trial and effectively cross-examined the witness who identified Bullock's voice on the tape. The trial judge listened to the tape, and while a transcript of the conversation would have been most beneficial to aid in the determination of its accuracy, she was within her discretion to admit the audio tape into evidence. Bullock's contention that his conviction should be overturned based on the admission of the audiotape is not well-taken.

### 2. *Apprendi* **and Bullock's Sentence**

Bullock also argues that he must be re-sentenced because the trial court violated the holding of *Apprendi v. New Jersey*, 530 U.S. 466 (2000), by sentencing Bullock beyond the statutory maximum based on an amount of methamphetamine that was not considered and expressly found by the jury. He argues that, by adopting the calculations offered by the probation office, the court sentenced Bullock at an Offense Level 32, rather than an Offense Level 26 to 30, and that the corresponding sentence was increased from a range of 78 to 97 months to a range of 188 to 235 months. The statutory term of imprisonment for each count of conviction (Counts 2, 12, 15 and 16) is five to forty years under 21 U.S.C. § 841(b)(1)(B). The district court determined that Bullock was responsible for 795.6 grams to 1.30 kilograms of a methamphetamine mixture. The jury found him responsible for an amount between 50 grams and 500 grams.

The government contends that sentencing guideline determinations are not affected by *Apprendi* and that there is no *Apprendi* error where, as here, the sentence was within the applicable statutory maximum. This Court reviews *de novo* Bullock's contention that the district court violated *Apprendi* by sentencing Bullock beyond the statutory minimum based upon an amount of drugs not determined by the jury. The Court reviews constitutional challenges to a sentence *de novo*. *United States v. Campbell*, 279 F.3d 392 (6th Cir. 2002); *United States v. Strayhorn*, 250 F.3d 462, 467 (6th Cir. 2001).

This Court has consistently approved of Guideline enhancements so long as the resulting sentence falls below the congressionally-prescribed statutory maximum. *See United States v. Lawrence*, 308 F.3d 623, 634 (6th Cir. 2002) (noting that *Apprendi* "applies only where the finding 'increases the penalty . . . beyond the prescribed statutory maximum'" and does not apply to the Guidelines); *United States v. Garcia*, 252 F.3d 838, 843 (6th Cir. 2001); *see also United States v. DeJohn*, 368 F.3d 533, 546 (6th Cir. 2004); *United States v. Helton*, 349 F.3d 295, 299 (6th Cir. 2003); *United States v. Solorio*, 337 F.3d 580, 597 (6th Cir. 2003). On this basis, Bullock's sentence did not violate the rule of *Apprendi*.[5]

### 3. Upward Departure for Bullock's Criminal History

In *United States v. Booker*, the Supreme Court found that a district court's obligation to treat the Sentencing Guidelines as mandatory, and, in particular, those portions of the Sentencing Guidelines that require a district judge to make factual findings which increase the sentencing range, violated a defendant's Sixth Amendment right to a trial by jury. 125 S.Ct. at 756. *Booker*

---

[5]The Court, however, addresses the impact of *United States v. Booker*, 125 S.Ct. 738 (2005), *infra*, and determines that Bullock must be resentenced.

was decided after the district court imposed sentences on all three Appellants. The Supreme Court in *Booker* held that a district court must still consider the Sentencing Guidelines range, while treating such range as advisory. This Court will first consider the arguments raised by Bullock regarding the computation of his sentence under the Guidelines and, *infra*, discuss the impact of *Booker*.

The district court determined that Bullock's criminal history score did not adequately reflect the seriousness of his actual criminal past. Bullock maintains that he must be re-sentenced because the trial court improperly granted the government's motion for an upward departure based on an under-representation of Bullock's criminal history.

When considering an upward departure for an under-representation of criminal history, federal Sentencing Guidelines § 4A1.3 provides as follows:

> (1) **Standard for Upward Departure**.--If reliable information indicates that the defendant's criminal history category substantially under-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes, an upward departure may be warranted.

*See also United States v. Mayle*, 334 F.3d 552, 556 (6th Cir. 2003) (discussing application of upward departure under the Sentencing Guidelines). A departure based upon under-representation of criminal history is expressly encouraged by the Sentencing Guidelines. *United States v. Barber*, 200 F.3d 908, 912 (6th Cir. 2000)(citing *United States v. Pluta*, 144 F.3d 968, 977 (6th Cir. 1998)). "[W]hen a sentencing court concludes that a departure is proper, it must provide a 'specific reason' supporting its decision to depart." *Mayle*, 334 F.3d at 566-67. A district court satisfies this burden by providing "a short, reasoned statement from the bench identifying the aggravating factors and the court's reasons for connecting them to permissible grounds for departure." *Id*. at 567. When considering an upward departure based on criminal history, the district court "must 'move stepwise

-11-

up the ladder' of criminal history categories, and 'make specific findings, articulated in language relating to the guidelines, concerning the inadequacy of any sentencing categories passed over." *Id.* at 566 (quoting *United States v. Cooper*, 302 F.3d 592 (6th Cir. 2002)).

Bullock had an extensive criminal history prior to 1983. These convictions did not result in criminal history points, given the age of the convictions. But the district court is permitted to consider these offenses in determining whether an upward departure is warranted.[6] The probation office determined that Bullock's criminal history qualified him as a career offender pursuant to U.S.S.G. § 4B1.1 and established his criminal history category at VI. The probation office re-investigated Bullock's criminal history with specific attention to the convictions that were the basis for career offender status. His adult criminal convictions include first-degree assault, burglary, and kidnapping at gunpoint. He was convicted of escaping jail, twice, while serving on the felony charges in 1981. He also was convicted of theft for stealing a pickup truck in 1981. The district judge granted Bullock's motion to exclude a 1983 conviction for first-degree robbery because the conviction was not supported by documentation concerning the plea, the judgment or a date of discharge for the offense. The court noted, however, that a preponderance of the evidence supported the existence of the 1983 conviction because Bullock had sought and received "shock" probation for the charge and admitted to being in custody of the Kentucky Bureau of Prisons during the time following the conviction.

Bullock contends that the district judge failed to follow the required framework when she

---

[6]Under U.S.S.G. § 4A1.2(e)(3), any prior sentence of imprisonment imposed beyond fifteen years prior to the defendant's commencement of the instant offense is not counted in the computation of criminal history. The Guidelines provide, however, that "[i]f the court finds that a sentence imposed outside this time period is evidence of similar, or serious dissimilar, criminal conduct, the court may consider this information in determining whether an upward departure is warranted under § 4A1.3 (Adequacy of Criminal History Category)." U.S.S.G. § 4A1.2 cmt. 8.

granted a two-point enhancement to Bullock's criminal history score, moving him from a Category III to a Category V. Bullock had four (4) convictions after 1983: felon in possession of a firearm; menacing; public intoxication and driving under the influence of drugs. Bullock contends that the district court increased his criminal history based on a single "serious" felony, possession of a fire arm, and minor misdemeanor offenses.

The district court moved stepwise up the ladder of criminal history category and made specific findings to support her decision to depart from Category III to Category V. By excluding the 1983 conviction, Bullock's points placed him in a Category III criminal history. The district court found that Bullock's "entire criminal history" was not consistent with a Category III criminal history given his extensive criminal past. The district court determined that a one-level increase to a Category IV would be "too low," as Bullock's 1983 conviction alone, had it been included, would have placed him in a Category IV. The district judge determined, nonetheless, that Category VI was "too high." As the district judge observed, "I am not looking at the [1983 conviction in the] Jackson County case, which I firmly believe by a preponderance of the evidence did occur." (J.A. at 1355.) "However, when I'm considering the Jackson County situation, everything, reaching all the way back in Mr. Bullock's past, I think [a] two-level departure is appropriate. And his criminal history is more akin to those in a . . . Category V . . . than it is in a three, or really even a four." (*Id*.)

As explained by the district court, Bullock has been convicted of four crimes since 1983. He was also convicted of a number of serious felonies prior to 1983, which were not assessed criminal history points. Regardless of the standard of review used, the decision of the district court was supported by Bullock's actual criminal past.

-13-

**B. Troy Kirby**

     **1.       Searches of October 11, 2000 and February 12, 2001 - Violations of Fourth and Fourteenth Amendments**

Troy Kirby contends that the warrants supporting the searches of October 11, 2000 and February 12, 2001 were deficient and not supported by probable cause. The district court determined that both search warrants at issue were sufficiently particular in their description of the place to be searched and that both were supported by probable cause. The district court therefore denied Troy Kirby's motion to suppress. We review the district court's factual findings for clear error and legal conclusions *de novo*. *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999). We consider the evidence in the light most favorable to the government. *Id.* (citing *United States v. Buchanon*, 72 F.3d 1217, 1223 (6th Cir. 1995)). This Court must give deference to the district court's credibility determinations. *Id.* at 264-65 (citing *United States v. Bradshaw*, 102 F.3d 204, 210 (6th Cir. 1996)).

     **a.      *Federal Search Warrant - October 11, 2000***

On October 11, 2000, FBI Special Agent Timothy S. Briggs sought a warrant to search Troy Kirby's residence. The search warrant provided the following description of the premises to be searched:

> A single wide mobile home, gray and off-white in color, with a wood decking front porch situated at Dixie Trailer Park in Mount Vernon, Kentucky, owned and occupied by Troy Kirby. See photo attached. This residence can be located by traveling South on KY route 461 from the junction of KY route 461 and KY route 150, traveling 1.7 miles, and turning left into family restaurant gas and grocery. Make and [*sic*] immediate right and travel .3 miles to said residence, which is located on the right. As you are facing this residence, the residence to the left is a single wide white trailer with black shutters, halloween decorations on the front porch, with bales of hay, pumpkins and corn stalks in the front lawn.

(J.A. at 203.) Special Agent Briggs, who had been employed with the FBI for four (4) years at the

time and assigned to a joint narcotics investigation, provided an eight-page detailed affidavit and stated that he had reason to believe that evidence of a criminal offense would be found on the property. Briggs recited information that he had received from a confidential source relating to Troy Kirby, including the fact that Kirby had been receiving supplies used in the manufacture of methamphetamine. Briggs also related that the confidential source had witnessed Troy Kirby making methamphetamine at his residence, and that the agent and the confidential source traveled to Dixie Trailer Park where the confidential source pointed out Troy Kirby's residence. Agent Briggs also had information that corroborated the confidential witness's information. Among other things, on October 7, 2000, a state trooper had stopped Troy Kirby and Phillip Kirby for a routine traffic violation and found them in possession of methamphetamine, marijuana, three boxes of pseudoephedrine, cash and a firearm.

Troy Kirby contends that the property is not described with sufficient particularity in the warrant or supporting affidavit. He argues that it is reasonable to believe there were other gray and off-white trailers in the mobile home park and, given that the date of the warrant, October 11, 2000, was close to Halloween, many trailers in the trailer park would have been decorated for the holiday. He also maintains that Briggs's affidavit is deficient because it relies on hearsay information from an unidentified source.

### 1. *Sufficiency of the description of the property*

In determining whether the place to be searched is described with sufficient particularity, the Court questions "whether the place to be searched is described with sufficient particularity as to enable the executing officer to locate and identify the premises with reasonable effort, and whether there is any reasonable probability that another premises might be mistakenly searched."

-15-

*United States v. Gahagan*, 865 F.2d 1490, 1496 (6th Cir. 1989)(citations omitted). If the warrant is sufficiently particular, it is appropriate also to consider an accompanying affidavit and facts known by the executing officer regarding the property to be searched. *Id*. at 1497; *see United States v. Pelayo-Landero*, 285 F.3d 491, 495-98 (6th Cir. 2002)(noting that a police officer may particularize an imprecise address by relying on personal knowledge to identify place to be searched).

In this case, the warrant accurately describes the premises as a single-wide, gray and off-white mobile home with a wood decking front porch. The description also provides specific mileage and driving instructions to the residence and details about the trailer home that is located immediately adjacent to the subject residence, noting that the unit directly to the left was decorated for Halloween. To further identify the residence, Briggs attached a photograph to his affidavit which depicts the subject residence as well as the trailer with black shutters located to the left thereof.

The magistrate judge evaluated the credibility of the witnesses and the facts at the suppression hearing and correctly recommended that the description was sufficiently particular and accurate. Moreover, the magistrate judge correctly determined that there was virtually no probability that the wrong premises would be searched pursuant to this search warrant, particularly because Special Agent Briggs, the Affiant who took the photographs of the trailer, also executed the search warrant. Accordingly, the district court properly adopted the magistrate judge's conclusion because the warrant included a sufficient description of the premises to be searched.

2. *Probable cause*

In determining whether probable cause existed to believe that evidence of criminal activity

-16-

was located in a particular place at the time the search warrant was issued, the Court considers the "totality of the circumstances" presented in the search warrant affidavit. *Illinois v. Gates*, 462 U.S. 213, 230 (1983). "Probable cause exists when there is a 'fair probability,' given the totality of the circumstances, that contraband or evidence of a crime will be found in a particular place." *United States v. Loggins*, 777 F.2d 336, 338 (6th Cir. 1985)(per curiam). "'Probable cause is defined as reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion.'" *United States v. Johnson*, 351 F.3d 254, 258 (6th Cir. 2003)(quoting *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir.1990)).

The affidavit of Agent Briggs establishes probable cause for the issuance of the search warrant. The search warrant affidavit sets forth significant corroboration of the information obtained by the confidential source, including the following facts: (1) on September 29, 2000, the source and Briggs went to Dixie Trailer Park and the source pointed out Troy Kirby's residence; (2) the confidential source stated to Briggs that he had seen Kirby making methamphetamine at his residence; (3) on October 3, 2000, the police made a traffic stop of Chris Malin, who had 15-20 boxes of pseudoephedrine, an ingredient used in the manufacturing of methamphetamine, and stated that he was traveling to see Troy Kirby; and (4) on October 7, 2000, the police stopped Kirby, who had methamphetamine and pre-cursor chemicals in his possession. Although the affidavit does rely on hearsay from an unidentified source, that information is sufficiently corroborated to substantiate the search warrant. The magistrate judge correctly determined that the search warrant was supported by probable cause and the district court correctly adopted these recommendations.

### b.     *State Search Warrant of February 12, 2001*

On February 12, 2001, Kentucky State Trooper Scott Miller obtained a warrant to search

Troy Kirby's residence, his vehicles and any persons in Troy Kirby's residence. Miller's affidavit states that Troy Kirby's residence is the fourth gray trailer on the right, lot number 32, Dusty Trails Subdivision, owned by Troy Kirby, more particularly described as follows:

> [T]ravel from the Rockcastle County Courthouse, travel west on U.S. 150 for 1.5 miles, turn left and travel south on KY 461 for 1.4 miles, turn left at J&J Market onto Dusty Trail Subdivision. [T]ravel approximately .2 miles, turn left on blacktop road travel approximately .1 miles to a gray trailer with small wooden deck on the front, belonging to Troy Kirby.

(J.A. at 215.) Miller's affidavit also describes the vehicles to be searched and the property to be seized. He also recites that his request for a search warrant is based on his own observations and information he had received from Mike Coomer, a Kentucky state probation officer, to the effect that Troy Kirby was manufacturing methamphetamine. Trooper Miller also sets out in great detail that he was leaving the Dusty Trail Subdivision on February 12, 2001 and observed a beaten-up gray pick-up truck that matched the description of a vehicle driven by William Baker, Jr. Trooper Miller noticed that this gray pick-up truck had obscured license plates. Miller knew that an arrest warrant had been issued for William Baker, Jr. for violating his parole. He therefore followed the gray pick-up truck to investigate. The truck went to Troy Kirby's driveway, at which time the driver exited the vehicle and ran into a field; the passenger in the truck ran into the trailer. Miller apprehended the driver, who was identified as William Baker, Jr. Miller then entered Kirby's trailer in pursuit of the passenger. Miller searched the truck, which was registered to "Troy Kirby," and found letters addressed to Troy Kirby. Miller also stated that he received information from Mike Coomer that Troy Kirby was manufacturing methamphetamine.

The Rockcastle County Trial Commissioner issued the warrant. The police searched Troy Kirby's house, truck and shed pursuant to the warrant and seized the evidence which was the

subject of the motion to suppress.

Troy Kirby challenges the validity of this search warrant, asserting that it fails to establish probable cause and that it does not describe the location to be searched with sufficient particularity.

*1.* *Sufficiency of the description of the property*

Kirby contends that the trailer located on lot #32 is owned by his parents, Troy Kirby, Sr. and Eula Kirby, and that his trailer is located on lot #33. Kirby submits that the warrant is therefore invalid.

In *Gahagan*, 865 F.2d at 1496, this Court sustained a search warrant that had incorrectly noted the street number address of the residence to be searched. The Court noted that, in reviewing the sufficiency of a description of property, it is appropriate to consider an accompanying affidavit and the facts known by the executing officer that are not set forth in the affidavit. *Id.* In this instance, Trooper Miller pursued a truck to the residence and entered it in search of a fleeing suspect. He was also the affiant and executing officer of the search warrant. Furthermore, Trooper Miller testified that Kirby told him that his trailer was located on lot #32. Thus, Kirby's argument that the search warrant is invalid is not meritorious. The magistrate judge therefore appropriately determined that the search warrant sufficiently described the property and that it would be virtually impossible for Miller to have mistakenly searched the wrong premises.

Troy Kirby also contends that a discrepancy exists between the search warrant issued on October 11, 2000 and the search warrant issued on February 12, 2001 because the former refers to the trailer being located at Dixie Trailer Park, whereas the latter indicates that the trailer is located at Dusty Trail Subdivision. Agent Briggs testified at the suppression hearing, however, that no signs or markers identify the name of the trailer park and that the area is commonly known both as

Dixie Trailer Park and Dusty Trail Subdivision. Briggs's testimony in this regard was unrefuted. The magistrate judge therefore properly concluded that there was no discrepancy between the two warrants and that the difference in the names of the trailer park identified in the two affidavits was inconsequential insofar as determining the particularized description of the property to be searched.

### 2. Probable Cause

Troy Kirby also challenges the validity of the search warrant, arguing that Trooper Miller's affidavit is based on hearsay that was not sufficiently corroborated by independent investigation. The record reveals, however, that Trooper Miller had probable cause to believe that he would find drug evidence during a search of Troy Kirby's residence. A state probation officer advised Trooper Miller that an arrest warrant had been issued for William Baker, Jr., for parole violations; Baker was staying at Troy Kirby's residence; Baker and Troy Kirby were suspected of manufacturing methamphetamine; and Baker drove a gray Ford pick-up truck. Trooper Miller corroborated the statements by conducting his own investigation, during which he observed the gray pick-up truck with an obscured license plate. Miller pursued it to the residence of Troy Kirby at which point the occupants of the truck fled. Trooper Miller apprehended the driver, William Baker, Jr., and searched the gray truck, which was registered to "Troy Kirby"[7] and contained papers addressed to Troy Kirby. At the suppression hearing, Trooper Miller testified that he saw the passenger run into Kirby's trailer, but could not identify the passenger. Miller acknowledged that the passenger may have exited the trailer while he chased and apprehended the driver, William Baker. When Trooper Miller returned to the trailer to search for the passenger, Troy Kirby permitted a limited search for the purpose of looking for the passenger. Troy Kirby escorted Miller around the trailer.

---

[7]Further investigation revealed that the truck was registered to Troy Kirby, Sr. and Eula Kirby.

-20-

In view of the foregoing facts, Trooper Miller sought and obtained the search warrant in question on February 12, 2001. The hearsay information supplied by the Kentucky probation officer was corroborated by Trooper Miller's independent investigation. Miller further had probable cause to search the gray pick-up truck to investigate the traffic violation of having an obscured license plate. Given all of the information that Miller obtained from the probation officer, from his own investigation, and all of the developments that occurred after he stopped the gray pick-up truck, the magistrate judge was justified in determining that probable cause existed for the issuance of the search warrant in question. The decision of the district court adopting the report and recommendation of the magistrate judge, which recommended denial of the motion to suppress, is therefore affirmed in all respects.

## 2.    Duplicitous Indictment

Troy Kirby also argues that a duplicitous indictment in this case deprived him of his right to a unanimous verdict and was a violation of his substantive due process rights. The government maintains that Troy Kirby has waived his claim that the conspiracy charges in the indictment were duplicitous by failing to raise the claim prior to trial. The government nonetheless argues that Counts 1 and 2 of the indictment were not duplicitous.

An error in the indictment must be reviewed prior to trial or the claim is waived. *United States v. Miller*, 161 F.3d 977, 982 (6th Cir. 1998)(citing Fed. R. Crim. P. 12(b)(2)); *United States v. Hart*, 70 F.3d 854, 859-60 (6th Cir. 1995) (multiplicity claim waived if not raised prior to trial under Fed. R. Crim. P. 12(b)(2)). Troy Kirby failed to raise this claim prior to trial. This Court therefore reviews this issue for plain error. *United States v. Wilson*, 168 F.3d 916, 923 (6th Cir. 1995).

Kirby asserts, however, that he is not appealing the issue of the technical defect of the indictment, but instead maintains that the government's evidence at trial, and therefore, the government's contention, was that Kirby was part of three separate conspiracies, with three completely different groups of people, which occurred from January 2000 until April 2001, the time-frame outlined in Counts 1 and 2 of the superseding indictment.[8] He argues that the government essentially grouped six (6) separate offenses into two counts of the indictment, the result of which was to deprive him of a unanimous verdict on all counts.

"An indictment is duplicitous if it 'joins in a single count two or more distinct and separate offenses.'" *United States v. Campbell*, 279 F.3d 392, 398 (6th Cir. 2002)(quoting *United States v. Shumpert Hood*, 210 F.3d 660, 662 (6th Cir.2000)). As this Court has noted,

> The vice of duplicity is that a "jury may find a defendant guilty on the count without having reached a unanimous verdict on the commission of any particular offense." *Shumpert Hood* at 662. By collapsing separate offenses into a single count, duplicitous indictments "prevent the jury from convicting on one offense and acquitting on another." *Id*. Therefore, duplicitous indictments implicate the protections of the Sixth Amendment guarantee of jury unanimity. *Id.*

*Campbell*, 279 F.3d at 398.

In this case, Count 1 charged Troy Kirby and others with a conspiracy to manufacture

_____

[8]Kirby contends that the government presented the following proof of three different conspiracies, which Kirby argues should have been indicted separately:

(1) that he was involved in a conspiracy with Mr. William Maness that began in January 2000 through August 2000, at which point the relationship ended; and that he was involved in another conspiracy involving the manufacturing and distribution of methamphetamine with William Maness from February 2000 through August 2000, at which time Kirby's relationship and activities with Maness were terminated; and
(2) that he began a new criminal conspiracy with the intent to manufacture and distribute methamphetamine with Phillip Kirby, Jennifer Kirby and others during the fall of 2000 and that this relationship ended in December 2000 or January 2001; and
(3) that he began a third conspiracy with William Baker and Gary Elliott in January or February 2001, which ultimately resulted in the search of Mr. Kirby's residence on February 12, 2001.

methamphetamine from January 2000 through April 4, 2001. Count 2 charged Troy Kirby and others with a conspiracy to possess with intent to distribute methamphetamine during the same period of time. We do not consider these charges of conspiracy to raise a meritorious claim regarding a duplicitous indictment. Arguably, however, Kirby raises an issue with regard to a potential variance of the proof at trial with the charges in the indictment. "If an indictment alleges one conspiracy, but the evidence can reasonably be construed only as supporting multiple conspiracies," then a variance exists. *United States v. Rios*, 842 F.2d 868, 872 (6th Cir. 1988) (citations omitted). In order to obtain a reversal due to a variance, a defendant must show that the variance affected "some substantial right of the defendant." *United States v. Kelley*, 849 F.2d 999, 1002 (6th Cir. 1988).

Troy Kirby failed to raise his variance claim at trial or to move for a multiple-conspiracy instruction. These failures limit the Court's review to one for plain error. *Wilson*, 168 F.3d at 923. "Plain error occurs when the error 'seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *Id*. at 923 (citations omitted). Here, there was no variance between the conspiracy charges and the proof at trial. "The issue of '[w]hether single or multiple conspiracies have been shown is usually a question of fact to be resolved by the jury . . . and [is] to be considered on appeal in the light most favorable to the government.'" *United States v. Ghazaleh*, 58 F.3d 240, 244-45 (6th Cir. 1995) (quoting *United States v. Segines*, 17 F.3d 847, 856 (6th Cir. 1994) (citations omitted)). "While drug conspiracies may often be divided into several sub-agreements, separate agreements do not preclude the existence of one substantive conspiracy." *United States v. Gaitan-Acevedo,* 148 F.3d 577, 586 (6th Cir. 1998).

The jury could have reasonably concluded that one overarching conspiracy existed in this

case. The witnesses testified that they observed Troy Kirby manufacture methamphetamine and that numerous individuals purchased the drug from him. Numerous individuals purchased precursor materials to be used in the manufacturing process. The evidence demonstrated that many individuals joined Troy Kirby in a conspiracy with one overarching plan to possess with intent to distribute methamphetamine.

In sum, Troy Kirby waived any claim that the conspiracy charges in Counts 1 and 2 of the indictment were duplicitous or at a variance by not raising these defects in the indictment prior to trial. Regardless, Counts 1 and 2 are not duplicitous. To the extent Troy Kirby's argument is that there was a variance in the indictment, he likewise failed to raise this argument at trial. Moreover, there was no variance between the conspiracy charges and the proof at trial and the evidence can be reasonably construed as supporting one conspiracy.

### 3. Videotape and *Brady*

Troy Kirby entered a plea of not guilty on August 10, 2001 and made a motion for discovery on August 13, 2001. The magistrate judge issued a general order of discovery on August 15, 2001. On October 4, 2001, the court allowed Kirby's attorney to withdraw and appointed his current counsel. Kirby's former attorney forwarded to new counsel the discovery responses that the government had previously provided. These materials may or may not have included a surveillance tape made during the February 12, 2001 traffic stop. Troy Kirby contends that the material on this tape was exculpatory in nature, and that the prosecution failed to provide this material in response to his discovery requests. Kirby argues that the material on the videotape was favorable to him in that the tape demonstrates Trooper Miller inaccurately described the events on February 12, 2001. Kirby maintains that the tape shows that no exigent circumstances justified the search of his

residence on that day and therefore the police never would have had probable cause for the issuance of the warrant they received based on the events of that day.[9]

Kirby contends that the prosecution's failure to provide him with a copy of a videotape of the February 12, 2001 traffic surveillance and stop until the day before the conclusion of the trial violated his right to exculpatory evidence and notions of due process as defined in *Brady v. Maryland*, 373 U.S. 83 (1963). The standard of review for the materiality of a purported *Brady* violation is *de novo* because it presents a mixed question of law and fact. *United States v. Phillip*, 948 F.2d 241, 250 (6th Cir. 1991). But, where, as in this case, defense counsel did not make a motion for a mistrial or raise the question of a possible *Brady* violation to the district court, we review the issue for plain error. *United States v. Crayton*, 537 F.3d 560, 569 (6th Cir. 2004).[10]

In *Brady*, the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. "[F]avorable evidence is material, and constitutional error results from its suppression by the government, if there is a 'reasonable probability' that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419,

_____

[9]Troy Kirby asserts that he became aware of the tape late in the trial when his attorney was reviewing discovery with counsel for co-defendant Johnny Bullock. Kirby maintains that the government provided a copy of the tape to the other defendants in the case but did not disclose it to him.

[10]This Court has also noted that a defendant may waive his or her *Brady* claim, such that even plain error review is not required. *United States v. Crayton*, 537 F.3d 560, 569 (6th Cir. 2004)(citing *United States v. Scarborough*, 43 F.3d 1021, 1025 n.3 (6th Cir.1994); *United States v. Reeves*, 2000 WL 687649, at *2 (6th Cir. May 19, 2000)); *but see United States v. Hayes*, 218 F.3d 615, 619-20 (6th Cir. 2000) (noting that waiver limited to matters relating to Fed. R. Crim. P. 12). To meet the plain error standard, Troy Kirby must show an error that was "plain," offended "substantial rights," and "seriously affected the fairness, integrity or public reputation of [the] judicial proceedings." *United States v. Olano*, 507 U.S. 725, 734-35 (6th Cir. 1995).

433-34 (1995).

Troy Kirby raises for the first time on appeal that the government withheld the tape. During the trial, however, Kirby's counsel indicated that he had obtained a copy of the tape during discovery. (J.A. at 1199-1200.) He argues that the tape would have been relevant to the district court's determination of exigent circumstances and probable cause for the issuance of the February 12, 2001 search warrant. Whether the suppression hearing might have come out the other way, however, is of questionable relevance to the *Brady* issues at stake here. "[I]t is hardly clear that the *Brady* line of cases applies to suppression hearings. Suppression hearings do not determine a defendant's guilt or punishment, yet *Brady* rests on the idea that due process is violated when the withheld evidence is 'material either to guilt or punishment . . . .'" *United States v. Bowie*, 198 F.3d 905, 912 (D.C. Cir. 1999)(citing *Brady*, 373 U.S. at 87).

Even if we disregard defense counsel's admission at trial that he had been given the tape and that he failed to raise the issue of a potential *Brady* violation in the district court, Troy Kirby still cannot show prejudice. As set forth above, the search warrant was supported on various grounds, including independent evidence not relating to the traffic stop, such as information from the state probation officer.

Thus, there appears to have been no *Brady* violation. Even if there had been, "[t]he proper inquiry is whether the *Brady* violation undermines confidence in the verdict, because there is a reasonable probability that there would have been a different result had the evidence been disclosed." *Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998). Nothing in the record of this case would lead to the conclusion that the jury would have reached a different result if the defense had the tape of the traffic stop earlier in the trial. Therefore, there was no violation of Troy Kirby's

constitutional rights under *Brady*.

4.      **Rule 29 Motion**

Finally, Troy Kirby contends that the district court's denial of his motion for judgment of acquittal to dismiss Counts 7 and 17 of the indictment under Fed. R. Crim. P. 29 was an error of law and that the government failed to adduce sufficient evidence to demonstrate that he attempted to manufacture methamphetamine.  In reviewing the district court's denial of a motion for acquittal, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *United States v. Alvarez*, 266 F.3d 587, 596 (6th Cir. 2001).  An appellant "claiming insufficiency of the evidence bears a heavy burden." *United States v. Maliszewski*, 161 F.3d 992, 1005 (6th Cir. 1998). In assessing the sufficiency of the evidence, the Court does "not weigh the evidence, assess the credibility of the witnesses, or substitute our judgment for that of the jury." *United States v. Salgado*, 250 F.3d 438, 446 (6th Cir. 2001)(citations omitted). When reviewing a defendant's claim of insufficient evidence, the court draws "all available inferences and resolve[s] all issues of credibility in favor of the jury's verdict." *Id*.  Review of the sufficiency of the evidence, therefore, is "quite limited." *United States v. Crossley*, 224 F.3d 847, 855 (6th Cir. 2000).

In Counts 7 and 17, Troy Kirby was charged with an attempt to manufacture methamphetamine on October 11, 2000 and February 12, 2001 in violation of 21 U.S.C. § 846.  To carry its burden on these counts, the government must prove both specific intent to engage in the criminal activity and the commission of an overt act that constitutes a substantial step towards the commission of the crime.  *United States v. Khalil*, 279 F.3d 358, 368 (6th Cir. 2002).  The

requirement of a substantial step is an objective one, for which the "'appellate court evaluates whether any reasonable person could find that the acts committed would corroborate the firmness of a defendant's criminal intent, assuming the defendant did, in fact, intend to commit the crime.'" *Id.* (quoting *United States v. Bilderbeck*, 163 F.3d 971, 975 (6th Cir. 1999)).

Troy Kirby does not dispute the issue of intent with respect to the crime of attempt to manufacture methamphetamine. Instead, he claims that the United States was unable to prove that he made a substantial step in furtherance of the production of methamphetamine. He also maintains that he did not have the means to manufacture methamphetamine because the police did not find anhydrous ammonia during the searches, which is an essential ingredient for the manufacture of the drug.

The evidence presented at trial was sufficient to prove that Troy Kirby took a substantial step towards the commission of manufacturing methamphetamine. The government introduced evidence that Troy Kirby had recipes to manufacture methamphetamine and had assembled precursor materials necessary to produce methamphetamine. During the October 11, 2000 and February 12, 2001 searches, the police found methamphetamine recipes and materials that are used in the manufacturing process. The October 11, 2000 search and seizure yielded enough precursor materials to produce 360 grams of methamphetamine hydrochloride. During the February 12, 2001 search, the police seized precursor materials that could have produced 147.1 grams of the drug. The government also produced evidence that Troy Kirby routinely produced methamphetamine using anhydrous ammonia during these time periods. Jennifer Kirby lived with Troy Kirby during the October time period at issue and testified that Troy manufactured methamphetamine "every couple weeks." (J.A. at 884.) She regularly purchased precursor materials for Troy Kirby in exchange

for money or pain pills. William Baker testified that, from December 2000 to February 2001, Troy Kirby manufactured methamphetamine three or four times a week. Witnesses also testified that they traveled with Troy Kirby to Louisville, Kentucky to obtain anhydrous ammonia, that each time Troy Kirby filled six tanks with anhydrous ammonia, and that he kept the tanks under or behind his trailer. (William Maness, J.A. at 619-20, 645; William Baker, J.A.at 679-80; Jennifer Kirby, J.A. at 886, 891-92.)

These actions constitute sufficient "substantial steps" towards the commission of manufacturing methamphetamine to sustain the jury's conclusion that an attempt occurred. The district court's decision to deny Troy Kirby's motion for a judgment of acquittal is affirmed.

## C. Phillip Kirby

### 1. Breach of Plea Agreement

Phillip Kirby contends that the government breached its plea agreement by contending that his offense category should be increased by two levels under U.S.S.G. § 3B1.1 for his role as a leader and organizer. The plea agreement recommended a base offense level and a three-level reduction of that base offense level for Phillip Kirby's acceptance of responsibility. The plea agreement also provided that the relevant conduct attributed to Phillip Kirby would be limited to 339.82 grams of a mixture containing methamphetamine. The plea agreement did not specifically address enhancements under Chapter Three of the Guidelines, including the issue of whether Kirby was a leader or organizer.

Because a plea agreement is contractual in nature, the construction of which presents a question of law, we review the district court's interpretation of the plea agreement in this case *de novo*. *Fitch v. United States*, 282 F.3d 364, 366 (6th Cir. 2001). Whether the government's conduct

violated the agreement similarly presents a question of law that this Court reviews *de novo*. *United States v. Wells*, 211 F.3d 988, 995 (6ᵗʰ Cir. 2000). The Court must hold the government to "a greater degree of responsibility than the defendant . . . for imprecisions or ambiguities in . . . plea agreements." *United States v. Johnson*, 979 F.2d 396, 399 (6th Cir. 1992) (citation and quotation omitted).

Phillip Kirby relies exclusively on *Fitch* in arguing that his sentence must be vacated and that he must be resentenced. In *Fitch*, this Court concluded that the plea agreement at issue precluded the government from arguing at the sentencing hearing for an upward adjustment to the defendant's base offense level for her role as an organizer or leader. The plea agreement in *Fitch* provided that the government would recommend that "the defendant's base offense level be calculated using 1000 pounds of marijuana and 1 kilogram of cocaine and that no other relevant conduct be used to increase the defendant's base offense level." *Id*. at 366. At the sentencing hearing, the government requested that Fitch receive a four-point enhancement for her role in the offense as an organizer and leader under U.S.S.G. § 3B1.1(a). Fitch argued that she understood the plea agreement to mean that no conduct other than the quantity of drugs specified in the plea agreement would be used to increase her sentence. This Court, construing the ambiguities in the plea agreement against the government, as it must, concluded as follows:

> Under Sentencing Guidelines § 1B1.3 the term "relevant conduct" means "Factors that Determine Guideline Range." The section includes as relevant conduct those factors that contribute to adjusting the offense level upward. Thus, "relevant conduct" incorporates "the base offense level . . . specific offense characteristics . . . and adjustments in Chapter Three. . . ." U.S.S.G. § 1B1.3(a)(i)-(ii), (iv). As already explained, the base offense level is the starting point in the sentencing analysis. A defendant's leadership role is an adjustment to the base offense level, allowable pursuant to U.S.S.G. § 3B1.1(a). The base offense level therefore can be increased by the specific offense characteristics in Chapter Two and/or adjustments in Chapter Three. The sentencing guidelines define all of these factors as "relevant

-30-

conduct."

*Id.* The Court concluded that Fitch was justified in believing that, when the government agreed to recommend that no other "relevant conduct" would be used to increase her base offense level, the government would be foreclosed from arguing for an increase in her sentence by means of the leadership role enhancement under Section 3B1.1(a). *Id.*

By contrast, Phillip Kirby's plea agreement with the government in this case provides as follows: "[T]he parties agree that there are 339.83 grams of a mixture containing methamphetamine reasonably foreseeable to the defendant, Phillip Kirby (i.e., relevant conduct)." (Plea Agmt, ¶ 4(d).) The plea agreement also indicates that "[p]ursuant to §1B1.3, the defendant's relevant conduct includes 339.82 grams of a mixture containing methamphetamine," and "[p]ursuant to §2D1.1, the base offense level for count 11 is 28." The plea agreement specifically allowed both parties the option of "object[ing] to other calculations." Phillip Kirby argues that he understood these provisions to mean that the parties had agreed as to the level at which he would be sentenced subject only to unresolved questions about his criminal history.

The plea agreement in *Fitch* is distinguishable from the plea agreement that Phillip Kirby negotiated with the government in this case. In *Fitch*, the government expressly agreed that "no other relevant conduct be used to increase the defendant's base offense level." *Fitch*, 282 F.3d at 366. This Court found that language sufficiently ambiguous as to create a reasonable belief in the defendant that the government would not recommend other relevant conduct to increase her sentence, including an enhancement for her role as a leader or organizer. By contrast, the government here made no such promise to Phillip Kirby. Instead, the government agreed that a specified quantity of drugs would be used as relevant conduct and recommended a base offense

level. Moreover, the plea agreement here differs in another material aspect from the one at issue in *Fitch* in that neither party was limited from objecting to other calculations.

In this case, there is no ambiguity. No reasonable interpretation of the plea agreement here would permit the conclusion that the government was foreclosed from arguing for additional enhancements if the facts so warranted.

Accordingly, the decision of the district court is affirmed as to its determination that the government did not breach its plea agreement with Phillip Kirby.

### 2. Enhancement for Role as Leader or Organizer

Phillip Kirby further argues that the trial court erred by applying an enhancement for his role as an organizer, leader, manager or supervisor of criminal activity under U.S.S.G. § 3B1.1. Phillip Kirby also contends that the district court improperly applied U.S.S.G. § 3B1.1 and enhanced Kirby's base offense level by two levels for his role as a leader and an organizer. We review district court's application of the Sentencing Guidelines *de novo*, while the district court's findings of fact are reviewed for clear error. *United States v. Dupree*, 323 F.3d 480, 491 (6th Cir. 2003).[11]

The Sentencing Guidelines instruct a district court to increase a defendant's offense level by two levels if the defendant was "an organizer, leader, manager, or supervisor in any criminal activity." U.S.S.G. § 3B1.1(c). The court must consider several factors in applying the enhancement, including the nature of the defendant's participation of the criminal activity, recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, and participation in planning and organizing. U.S.S.G. § 3B1.1, cmt. 4. The enhancement applies even if the defendant was an organizer or leader of only one other participant. *Id.*, cmt. 2.

---

[11]Again, the Court will address the implications of *Booker* on Phillip Kirby's sentence, *infra*.

Phillip Kirby pleaded guilty to aiding and abetting in attempting to manufacture methamphetamine in violation of 21 U.S.C. § 846 (Count 11). The district court found that Phillip Kirby was a leader and an organizer and overruled his objection relating to the two-point enhancement for his role in the offense. As the trial judge articulated, Phillip Kirby was substantially involved as one of the leaders of the conspiracy. He recruited Cherrie McHargue and Jarrod Singleton. Phillip Kirby and his sister planned a trip to Dry Ridge, Kentucky to obtain precursor materials, including ephedrine tablets. He exerted control and authority over McHargue and Singleton. On that basis, the trial court determined, pursuant to U.S.S.G. § 3B1.1, that Phillip Kirby's participation in the commission of the offense, with regard to the overall conspiracy, was substantial. (J.A. at 1303-05.)

Although Phillip Kirby argues that the issue calls upon this Court to determine whether the district court erroneously applied the law, the question more accurately turns on the trial court's factual determinations. As such, the standard of review of a district court's application of provisions of the Sentencing Guidelines to the facts is treated deferentially and may not be disturbed unless clearly erroneous. *United States v. Webb*, 335 F.3d 534, 536-37 (6th Cir. 2003).

In this case, the district judge's finding that Phillip Kirby was a leader and an organizer was not clearly erroneous. The district court made sufficient findings of fact to support the conclusion that Phillip Kirby played an aggravated role as a leader or organizer for purposes of a two-point enhancement under U.S.S.G. § 3B1.1. The decision of the district court is assessing two points because Kirby was a leader or organizer is affirmed.

**V.**

Since the Appellants were sentenced, the Supreme Court in *United States v. Booker* held that "[a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by . . . a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." 125 S. Ct. at 756. The district court, acting without the benefit of the decision in *Booker*, made factual determinations by a preponderance of the evidence as to each Appellant that resulted in an increase in his sentencing range. The district judge also assumed at sentencing that the federal Sentencing Guidelines were mandatory, as that term is used in *Booker*.

In the case of Johnny Lee Bullock, the district court sentenced him on the basis that he had distributed 759.55 grams of methamphetamine, while the jury found him responsible for only 5 to 50 grams. Similarly, while the jury found Troy Kirby responsible for over 50 grams of methamphetamine, it did not find him responsible for 759.8 grams, which the district judge used as relevant conduct under the Sentencing Guidelines. Finally, the district judge determined that Phillip Kirby was an organizer, leader, or supervisor and enhanced his offense level by two levels. All of these findings were made not by a jury, but by a judge, who believed the Guidelines were mandatory. All of these findings increased the sentencing guidelines range for each Appellant.

Only Johnny Lee Bullock raised a Sixth Amendment issue in the district court.[12] Nonetheless, this Court employs the plain-error test when a defendant has failed to raise the Sixth Amendment challenge implicated by *Booker*. *United States v. Booker*, 125 S. Ct. at 769; *see also* Fed. R. Crim. P. 52(b). We conclude under the plain-error analysis set forth in *United States v.*

---

[12]On February 24, 2005, long after briefing and oral argument, Troy Kirby filed, *pro se* "Motion for Leave to Amend due to Supreme Court Ruling on *Booker* and *Fanfan* with Request to Remand for Resentencing."

*Olano*, 507 U.S. at 732-33, that the cases should be remanded for sentencing. *See United States v. Barnett*, – F.3d – , 2005 WL 357015 (6th Cir. 2005). It is clear that a plain error occurred; the substantial rights of all three appellants were affected; and the error "seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Bruce*, 396 F.3d 697, 718 (6th Cir. 2005) (citing *United States v. Bartholomew*, 310 F.3d 912, 926 (6th Cir. 2002)).

## VI.

Based upon the foregoing, these cases are remanded for resentencing under *Booker*. Otherwise, the conclusions of the district court are affirmed in all respects.